**Stephen Ray NETHERY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68849.**

Court of Criminal Appeals of Texas, En Banc.

May 22, 1985.

Rehearing Denied July 24, 1985.

Joe B. Goodwin, Beaumont, John Tatum, Dallas, for appellant.

Henry Wade, D.A. & Jeffrey B. Keck, Norm Kinne, Rider Scott & Hugh Lucas, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellant was convicted of capital murder. Upon receiving the jury's affirmative answers to the punishment issues, the court assessed punishment at death. See Art. 37.071, V.A.C.C.P.

Appellant alleges fifty-five grounds of error. We will first address his contentions that venirepersons were erroneously excused.

The trial court sustained the State's challenge for cause to three venirepersons —Williams, Simnacher, and Lee—because each of the three expressed a bias against the minimum punishment for the lesser included offense of murder. See Art. 35.-16(b)(3), V.A.C.C.P. Appellant does not dispute the showing of such bias. Rather, he contends that the State should not be permitted to utilize Art. 35.16(b)(3) when the bias is against the minimum range of punishment. He argues that the State never relies upon a minimum punishment for conviction or punishment and, thus, cannot be harmed by such a bias.

The State's interest is in fair and impartial jurors, in accord with our legal system's basic tenet to insure that every defendant is accorded a fair and impartial trial. The State seeks, or should seek, to uphold the integrity of the jury system. Therefore, the State is permitted to challenge a juror who cannot be fair and impartial because he will not consider the full range of punishment. Whether the State later urges the jury to assess the minimum or the maximum is of no moment.

Appellant invites us to overrule settled case law on this issue. We decline the invitation. The State is entitled to jurors who will consider the full range of punish-

ment. *Hernandez v. State,* 643 S.W.2d 397 (Tex.Cr.App.1983); *Chambers v. State,* 568 S.W.2d 313 (Tex.Cr.App.1978). No error is presented.

■ Venireperson Pippi and venireperson Keller were excused upon the State's challenge for cause. Each professed opposition to the death penalty and would vote "no" to the three punishment questions under Art. 37.071(b), V.A.C.C.P., regardless of the evidence, to prevent imposition of the death penalty. Keller was unequivocal in so stating. Pippi initially said that she was opposed to the death penalty in all cases, that she would never impose it, and that she was firm in that belief. Further questioning followed:

Q. ... Now, I take it from what you're telling me that your belief is so strong that you simply could not write yes three times, knowing that the Defendant would get death?

A. Probably not, no.

Q. Okay. I don't want to quarrel with you, Debbie, but we've got to pin it down a little bit more. I hope you understand the seriousness of what we're doing here.

. . . . .

Q. ... [K]nowing that if you answer yes three times, it's going to mean the death penalty, you just simply could not answer yes three times regardless of what the evidence showed, is that fair?

A. Ummm—I would probably have—no, I don't guess I could.

. . . . .

Q. And Judge Ryan would have the twelve people who are going to sit as jurors over here, have to take an oath to follow the law and the evidence; and what you're telling us is that you couldn't do that?

A. No, I couldn't.

Q. Because of your beliefs, regardless of what the evidence showed? You knew those three answers mean death and you simply couldn't answer yes

regardless of what the evidence showed?

A. That's right.

. . . . .

Pippi was then questioned by the defense attorney:

Q. At one time you said something about, I'm not sure or I don't know.

A. Well, I wouldn't want to take an oath to be responsible for doing something when I know that I couldn't do it, knowing what the outcome of it may be.

Q. Well, are you saying that you don't believe in the death penalty period, not as far as whether you could impose it or not, but are you saying you don't believe in the death penalty in any given situation?

A. I do not.

Q. You do not.

A. No sir, I don't believe that's up to us to impose that on people.

. . . . .

Q. ... Are you saying that you would automatically vote no so that the death penalty would not be imposed regardless of what evidence there was in reference to the questions?

A. I would probably, yes; I don't know. I would hope not to be in the situation to begin with.

Q. Well, none of us want to be in that situation, but, unless you tell me that you just automatically vote no, I'm not —I'm not sure that, that you couldn't be qualified. Now, if you tell me you automatically would vote no because you don't believe in the death penalty, then that pretty well rules you out; but if you have reservations about that, then we're at a different matter.

A. I can't say that I wouldn't for sure do it, but I probably would have to vote no to avoid the outcome.

Q. You know, we can—and I'm not trying to argue with you or anything, but you have undoubtedly read of cases where you thought that they were so extremely brutal, perhaps involving a

child or something of that nature, where the facts without going in—you can imagine what facts might be involved, are you saying that in absolutely no case, not whether or not you could assess the death penalty, but you don't believe in the death penalty?

A. I do not believe in it, no.

Q. Regardless?

A. Regardless.

Q. And then you would probably, you say, vote no in answer to the questions because regardless of the evidence, is that it?

A. Probably, yes.

Both jurors were properly excused. *Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Williams v. State*, 682 S.W.2d 538 (Tex.Cr.App.1984); *Woolls v. State*, 665 S.W.2d 455 (Tex.Cr.App.1983).

The grounds of error are overruled.

■ Appellant challenged five venirepersons on the basis of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The five venirepersons —Shaffer, Albough, Gann, Alders, and Bush—all stated that they would answer the punishment questions "yes" only if the State proved, beyond a reasonable doubt, that the answers should be "yes"; they would answer "no" if the State did not so prove. There was some confusion about the two stages of a capital murder trial. However, once the procedure was clarified all of the venirepersons said they would vote "no" to the punishment questions if the State failed to prove them beyond a reasonable doubt, and said they would not automatically vote for the death penalty if they found appellant guilty.[1] The grounds of error are overruled.

---

1. Venireperson Alders had some trouble understanding what the two stages meant in terms of punishment and guilt:

Q. ...[Y]ou've stated you would require the State to prove to you beyond a reasonable doubt that each one of these questions should be answered yes; you would require that, is that right?

A. Yes.

Q. But you've told me here that after the— before you get to the punishment phase, if you thought the party were guilty of the capital offense of murder, that you thought the proper punishment would be death?

A. But the law requires that in order to sentence him to death we answer all of these three questions yes, so I would have to follow the law.

Q. That's absolutely correct, but did you further tell me then that unless there was something brought out in that second phase that you would continue to feel like the proper punishment was death?

A. Unless I had answered one of these questions no.

Q. Beg your pardon?

A. I'm not—if there were one of these questions that I had to answer no, then—I'm not sure I understand what you mean.

Q. Well, I'm not trying to put words in your mouth. I'm only trying to interpret what you have told me and, like I say, from what you have told me, I understood you to say that before the punishment phase began if you believed beyond a reasonable doubt that the party were guilty of the capital offense of murder, that you at that point would think

that the party deserved the death penalty; is that correct?

A. Correct.

Q. And did you further tell me that unless you heard something in that second phase to change your mind you would still feel that the proper punishment was death?

A. Yes.

The prosecutor then questioned her as follows:

Q. Defense Counsel has asked you if you didn't hear anything different in the second phase, you would still feel that the proper punishment would be death. That's what you told him, right?

A. Yes.

Q. Even though you felt that way, would you still require us to prove to you beyond a reasonable doubt that the answer to those questions should be yes?

A. Yes.

Q. Regardless of what you [sic] feeling, whether you felt it ought to be life or whether you felt it ought to be death, you would answer those questions objectively based on the evidence or the lack of evidence?

A. Yes.

. . . . .

Q. All right. And if we failed to prove one or more questions beyond a reasonable doubt to you, your answer would be what to those questions?

A. It would be no.

Although the prosecutor could have better clarified the distinction between the two stages of the trial, Alders said she would follow the law and hold the State to its burden of proof at both stages.

■ Appellant's final contention concerning the voir dire is that his challenge for cause of venireperson Stancil should have been sustained because Stancil had previously expressed an opinion about the guilt or innocence of the murderer of the police officer.

Art. 35.16(a)(10), V.A.C.C.P. states that a challenge for cause may be made for the following reason:

That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the affirmative, he shall be discharged without further interrogation by either party or the court. If he answers in the negative, he shall be further examined as to how his conclusion was formed, and the extent to which it will affect his action; and, if it appears to have been formed from reading newspaper accounts, communications, statements or reports or mere rumor or hearsay, and if the juror states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that he is impartial and will render such verdict, may, in its discretion, admit him as competent to serve in such case. If the court, in its discretion, is not satisfied that he is impartial, the juror shall be discharged;

Stancil said that based upon what he had read he believed someone killed a police officer. Stancil told defense counsel that he had expressed an opinion previously in discussions with some of his policemen friends. He also said that he did not know whether appellant was the one who shot the officer. The court questioned him:

Q. Well, the question was based upon what you read, have you formed an opinion as to the guilt or innocence,

without going into what that opinion is?

A. Yeah, I would have to say I've formed an opinion.

Q. Now, based upon that and having formed an opinion, will it, the opinion, influence your verdict in this case?

A. I don't think it would.

Q. Okay. As you sit there right now, and you can return a verdict based upon the evidence and nothing else?

A. I think I could.

During the discussion with the court as to whether or not Stancil should be excused, the prosecutor specifically cited and quoted from *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980). *Barefoot* is controlling in the instant case; Stancil said he could base his verdict on the evidence presented and nothing else. He was qualified under Art. 35.16(a)(10). See *Barefoot*.

The ground of error is overruled.

Prior to the selection of the jury, appellant filed a motion for a change of venue under Art. 31.03, V.A.C.C.P. The State filed affidavits controverting the motion. At the hearing, appellant introduced several newspaper articles and photographs. No witnesses were called by either side. The court overruled the motion.

■ The applicant seeking a change of venue bears a heavy burden to prove the existence of such prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful. Absent such a showing, the trial judge is within the limits of his discretion in denying the change of venue. *Ussery v. State*, 651 S.W.2d 767 (Tex.Cr.App.1983); *James v. State*, 546 S.W.2d 306 (Tex.Cr.App.1977). The test is whether outside influences affecting the community's climate of opinion as to a defendant are inherently suspect. *Banks v. State*, 643 S.W.2d 129 (Tex.Cr. App.1983); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1960).

■ The few articles that were introduced appeared in the local newspapers immediately after the murder. The trial was held about four months later. Appel-

lant has not shown that outside influences affected the community's climate of opinion. Appellant does not contend that he was forced to take an objectionable juror. See *Stiehl v. State,* 585 S.W.2d 716 (Tex. Cr.App.1979). He has not even shown that venirepersons were affected. Due to the lack of proof of prejudicial publicity, the trial court did not abuse its discretion in overruling appellant's motion for a change of venue.

■ Appellant argues that his motion to quash the indictment should have been granted. First, he contends that the indictment is vague because it does not define "peace officer" under Art. 2.12, V.A.C. C.P.[2] The indictment alleged that appellant:

> did ... intentionally and knowingly cause the death of an individual, namely: J.T. McCarthy, *a peace officer, to-wit: a police officer for the City of Dallas,* by shooting the said J.T. McCarthy with a handgun, a deadly weapon, and the said J.T. McCarthy was then and there acting in the lawful discharge of an official duty, namely: investigation of a parked vehicle while the said J.T. McCarthy was on radio patrol and the said defendant then and there knew that the said J.T. McCarthy was a peace officer. (emphasis added)

■ Under the rationale of *Thomas v. State,* 621 S.W.2d 158 (Tex.Cr.App.1981) (opinion on rehearing) it is doubtful that the term "peace officer" need be defined at all. As stated in *Thomas* and reiterated in *Ferguson v. State,* 622 S.W.2d 846 (Tex.Cr. App.1981) (opinion on rehearing), and *Castillo v. State,* 689 S.W.2d 443 (1985), facts pertaining to the *defendant's* acts and conduct may be essential to giving notice—the manner and means of committing an offense may indeed be facts necessary to be alleged. But, facts not necessary to provide notice but that are rather essentially evidentiary, need not be alleged in an indictment because the indictment need not plead the evidence relied upon by the State. *Castillo,* supra, at 447. The term "peace officer" does not pertain to an act or omission of the accused.

Further, when a term is defined in the statutes, it need not be further defined in the indictment. *Thomas,* supra. "Peace officer" is statutorily defined. Art. 2.12. "Peace officer" is analagous to "owner" and for the same reasons need not be more specifically alleged. Further definition will not assist or affect the defense. *Thomas,* supra.

In any event, the allegation was specific: "to-wit: a police officer for the City of Dallas."

The fact that the allegation in the instant case did not allege that Dallas was an incorporated city is, for the same reasons, of no significance. The motion to quash was properly overruled.

Appellant also contends that the allegation, "shooting ... with a handgun ..." is too vague and subject to multiple interpretations. Appellant does not say what these other interpretations might be, and we do not know of any. The allegation is sufficient.

■ Finally, appellant contends that the description of how Officer McCarthy was in lawful discharge of an official duty is "vague and ambiguous as to time and place and the manner and means of investigation on radio patrol." The face of the indictment sets forth in plain and intelligible language sufficient information to enable the accused to prepare his defense. *Jeffers v. State,* 646 S.W.2d 185 (Tex.Cr.App.1981); *Haecker v. State,* 571 S.W.2d 920 (Tex.Cr. App.1978).

The allegation in the instant indictment does not describe an act of appellant, nor does it pertain to his conduct. Rather, it is directed toward the conduct of the peace officer. Cf. *Castillo,* supra. We need not decide whether an allegation of the statu-

---

**2.** Art. 2.12 states that the following are peace officers:

　　*　　*　　*　　*　　*　　*

(3) Marshals or police officers of an incorporated city, town, or village.

tory phrase "acting in the lawful discharge of an official duty" is sufficient. In the instant case the statutory phrase was defined more explicitly in the indictment by describing the acts that constituted such action, namely, "investigation of a parked vehicle while ... McCarthy was on radio patrol." The description of the officer's actions is more than adequate to provide notice and satisfies due process requirements of notice. See *Aranda v. State*, 640 S.W.2d 766 (Tex.App. San Antonio—1982). The ground of error is overruled.

▮ Appellant contends that the indictment is fundamentally defective because it fails to allege that the act occurred in Dallas County. The contention is without merit. The indictment states:

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS, the Grand Jurors, good and lawful men of the *County of Dallas* and State of Texas, duly elected, tried, impaneled, sworn and charged to inquire of offenses committed within the body of the said County of Dallas, upon their oaths do present in and to the 203rd Judicial District Court of Dallas County, at the January Term, A.D. 1981, of said Court that one Stephen Ray Nethery on or about the 23rd day of February in the year of our Lord One Thousand Nine Hundred and 81 *in the County and State aforesaid,* did then and there unlawfully, intentionally and knowingly cause the death of an individual.... (emphasis added).

The indictment specifically states that the offense occurred "in the County and State aforesaid," referring to Dallas County which was named previously. The ground of error is overruled.

Appellant attacks the sufficiency of the evidence, contending that there is no evidence that the police officers were acting in the lawful discharge of an official duty, or that appellant knew that the deceased was a police officer. Appellant also contends that the cause of death was not established under Art. 4447t, V.A.C.S.

Carol Stockman testified that she met appellant at a bar in Dallas on February 22, 1981. Appellant introduced himself and bought her several drinks, while drinking three "kamikazes" himself. After chatting for approximately thirty minutes, appellant asked Stockman if she wanted to smoke some marihuana. She agreed and they went to appellant's car, where he rolled a "joint". They drove to White Rock Lake and smoked the "joint" on the way. Appellant parked on a dirt road located adjacent to Lawther Drive. Stockman said it was a little after midnight by this time.

Appellant began kissing and fondling Stockman. She told him to stop, but he reclined both seats, climbed over her, and sat in the passenger seat. Appellant continued to fondle her and again she told him to stop. Stockman testified that appellant got angry because she would not let him touch her and he hit his hand on the dashboard. She felt a cold, heavy object hit her foot. As she reached down to find out what it was, appellant grabbed her arm and picked up a silver pistol. He pointed the pistol at her and told her to take off her clothes. She did so. Appellant performed oral sex on Stockman and attempted several times, unsuccessfully, to have sexual intercourse before finally succeeding. He told her he was sorry, that he did not mean to hurt her, and that he hoped she did not hate him.

Some time later, while appellant was attempting to have oral sex with her, Stockman heard a car nearby. She sat up and saw a police car drive by on Lawther Drive. She told appellant, but he did not look. He said, "No, it's not." She told him it was a police car and told him to look. He turned around and looked at the police car. Stockman testified that the car was a marked police car, complete with emblems, sirens and red lights. The police car circled around Lawther Drive and came up the dirt road toward appellant's car. Stockman said, "There's the police," and hurriedly began putting on her clothes. Appellant just sat in the car. He did not attempt to put on his clothes.

The police car pulled up parallel to appellant's car, with the driver's door of the police car next to the driver's door of appellant's car. The cars were approximately ten feet apart. Stockman saw a uniformed police officer get out of the driver's side of the car. She said to appellant, "There's the police; aren't you going to do something?" Appellant replied, "I'll blow his fucking head off." The officer walked over to the driver's door of appellant's car, shined his flashlight inside and said, "What are you kids doing out here?" Stockman responded, "Kids?" The officer then said, "Don't you know that you kids could go to jail for this?" She said that he then asked them to get out of the car. Appellant stepped out of the car on the passenger side. He still had not put any clothes on. Stockman heard appellant say, "I'm sorry, Sir," saw him raise his arm and put it across the top of the car, and then she heard three shots. She ducked and lay on the front seat. At this time, Stockman thought there was only one police officer present.

Stockman heard more shots in the distance and a few minutes later a police officer pulled her out of the car. She told the officer she had been raped, but he acted as though he did not believe her.

Phillip Brown, a police officer for the City of Dallas, testified that on February 22, 1981, he and his partner, John McCarthy, were on radio patrol for the 11:30 p.m. to 7:30 a.m. shift. Brown testified that part of their duties as police officers was to drive around White Rock Lake and investigate any parked motor vehicles. He said the area was a high crime area.

At approximately 1:30 a.m. on February 23, 1981, Brown and McCarthy were patrolling the White Rock Lake area, driving on East Lawther Drive. Brown was driving their marked Dallas Police car. Seeing a car parked just off Lawther road as they drove by, they circled back and drove up the dirt road toward the parked vehicle to investigate. Brown pulled the police car parallel to and about ten feet away from the parked car. When they drove up they could see only one person sitting in the car, on the passenger side.

Brown got out of his car, walked over to the driver's door, shined his flashlight in the window, and knocked on the window. He saw two people in the car, one sitting and one partially laying down in the front seat. The female, who was sitting, reached over and unlocked the door. Brown opened the door, and stepped back and to the rear of the car. Neither appellant nor Stockman looked at Brown. He said, "Come on kids, it's time to be moving out of here." Stockman said, "What do you mean 'kids.'" Brown replied, "Adults generally have more intelligence than being out here like this and besides that, you could go to jail for being out here like this." Brown testified that Stockman was dressed but that appellant was totally naked.

Brown said he had no intention of arresting the two and simply wanted them to leave. He turned to walk back to the patrol car to resume patrol. He saw McCarthy also turning to return to the police car. McCarthy was standing between the left front tire and the driver's door of appellant's car, about four feet from Brown. Appellant opened the passenger door and stepped out of the car. Appellant said, "I'm sorry, Officer," and Brown saw his right arm start to move up and then saw a reddish-orange flash and heard three quick shots. Brown saw McCarthy lying on the ground next to the tire of appellant's car. Brown fired two shots at appellant over the roof of the car and then ducked down behind the car. Appellant ran toward the lake and Brown fired another shot at him and chased him. Appellant dodged several trees and picnic tables, jumped over some logs and ran into the lake. Brown yelled at him to stop and fired a fourth shot at him. Appellant swam a few more yards and then stopped, stood up with his arms straight out to the side, and turned around. Appellant told Brown, "I'm sorry. Please don't hurt me." Brown yelled for him to come out of the water, which he did. Brown handcuffed him and went back up the hill to the cars.

As they went up the hill, Brown heard McCarthy calling for help on his walkie-talkie. McCarthy had crawled about thirty yards down the road from the cars and was lying on the ground. Brown saw that he had been shot in the back of the head. Brown radioed for help.

McCarthy was rushed to the hospital, where he died several days later.

Sergeant Henry Horn of the Dallas Police Department testified that he arrived at the scene of the crime between 2:00 and 3:00 a.m. on February 23, 1981. He assisted in gathering evidence and making measurements. Horn found a Clerke .32 caliber chrome revolver forty-seven feet away from appellant's car, beside a tree.

Allen Jones, a firearms examiner for the Dallas County Forensic Laboratory, testified that he examined a .357 magnum caliber Smith & Wesson belonging to McCarthy, a .38 caliber Smith & Wessen belonging to Brown, and a .32 caliber Clerke revolver found at the scene of the murder. Jones explained that when an officer fires a weapon in the line of duty, the weapon is routinely submitted to the laboratory to determine if it is operating normally. McCarthy's gun contained six live rounds and Brown's gun contained two live rounds and four spent rounds. All three weapons were in normal operating condition.

Jones said that because a Clerke revolver is a low quality weapon, a bullet fired from it can almost never be matched to a particular weapon by the rifling characteristics that are used to match other guns.[3] Jones testified that he received two fragments of a bullet that Dr. Besant-Mathews had removed from McCarthy's head. He said that while the bullet fragments could not be matched to a particular gun, he believed the rifling characteristics on the bullet were made by a .32 caliber Clerke gun. He stated further that there was no way the bullet fragments could have come from Brown's .38 caliber Smith & Wesson because the Smith & Wesson leaves distinctive rifling marks which can be matched to a particular gun, and because the bullets in Brown's gun were hollow point and the bullet that killed McCarthy was a round-nosed bullet.

Dr. Besant-Mathews was the medical examiner for Dallas County on February 25, 1981. He testified that McCarthy died as a result of a gunshot wound to the back of his head. The gunshot wound caused the brain to swell and caused pressure on the brain. McCarthy died as a result. Besant-Mathews also said that the wound was located in the right side of the back of the head, which was consistent with Brown's version of the shooting.

■ Appellant's first sufficiency contention is that the evidence does not show that the officers were engaged in the lawful discharge of an official duty. Brown testified that part of their duties as police officers was to patrol the White Rock Lake area and investigate parked motor vehicles. He said they were performing that duty when McCarthy was shot. The evidence is sufficient.

■ Appellant also contends that the evidence does not show that he knew McCarthy was a police officer. Brown testified that just before appellant shot McCarthy he said, "I'm sorry Officer." This statement, by itself, shows that appellant knew McCarthy was a police officer. Furthermore, the record reflects that both officers were wearing their uniforms and driving a marked police car which had sirens and lights mounted on the roof. Stockman testified that she told appellant the police were there and that the police car was clearly visible. The evidence is sufficient to prove that appellant knew

---

**3.** Jones explained that he matches a bullet to a particular weapon by comparing the bullet that is being used as evidence with a "known" bullet that he fires from the gun. Every gun barrel possesses some individual defects which are unique for each weapon. When a bullet is fired from a gun those defects leave unique and distinctive marks on the bullet—rifling characteristics. The bullets are then compared to see if the rifling characteristics correspond, indicating that the bullets were fired from the same weapon.

McCarthy was a police officer. Cf. *Bush v. State*, 628 S.W.2d 441 (Tex.Cr.App.1982).

■ Appellant's last contention concerning sufficiency is that the cause of death was not established under Art. 4447t, V.A.C.S.,[4] a civil statute relating primarily to the determination of death when life support systems are used to sustain life. We need not decide whether this article applies to any aspect of criminal cases. Contrary to appellant's assertion, there is no evidence in the instant case that McCarthy was ever on life support systems. Besant-Mathews testified that McCarthy was dead and had died from a bullet wound in the head. Besant-Mathews had no knowledge of the circumstances surrounding the hospital treatment of McCarthy. He performed the autopsy and determined the cause of death. The evidence is sufficient to prove the cause of death and to prove that appellant committed capital murder. The grounds of error are overruled.

For the same reasons, appellant's requested charge defining death under Art. 4447t and applying the same was properly refused. The ground of error is overruled.

■ Appellant complains of two instances in which the trial court sustained the State's objection to questions asked of Stockman by appellant's attorney. The defense attorney questioned Stockman as follows:

Q. ... You've lived a pretty colorful life, haven't you, Tina?

A. I don't know what you mean by that, sir.

Q. Well, you're not new to courtrooms, are you?

The State objected, arguing that the question about courtrooms was improper impeachment. There was a discussion out of the presence of the jury concerning Stockman's pending misdemeanor shoplifting case. The court permitted the defense attorney to question Stockman about that pending case, but sustained the State's objection to the above-quoted question about courtrooms.

■ Art. 38.29, V.A.C.C.P., governs the impeachment of witnesses by prior offenses. Ordinarily, a witness may not be impeached by a pending charge. The exception to this rule is that a court may permit impeachment by pending charges to show the bias, prejudice or interest of the witness in testifying. *Massengale v. State*, 653 S.W.2d 20 (Tex.Cr.App.1983). The question asked in the instant case was not a proper impeachment question under either Art. 38.29 or the bias exception. The question attempted to circumvent the prohibitions of Art. 38.29 and give the jury the impression that Stockman was a criminal and thus familiar with courtrooms. The court did not err in sustaining the objection to the question.

■ The second question about which appellant argues also concerns Stockman. The defense attorney asked Stockman how many times appellant had performed oral sex on her. He continued questioning her:

Q. Well, that didn't shock you, did it?

A. Yes, it did.

. . . .

Q. Well, that wasn't the first time you had indulged in oral sex, was it?

The prosecutor objected, stating that the question was not material to anything. The court sustained the objection.

Appellant argues that the question was proper because it shows the sexual knowledge of Stockman. Such knowledge is irrelevant to any issue in the case. The

---

**4.** Art. 4447t states:

Section 1.

(a) A person will be considered legally dead if, based on ordinary standards of medical practice, there is the irreversible cessation of spontaneous respiratory and circulatory functions.

(b) If artificial means of support preclude a determination that spontaneous respiratory and circulatory functions have ceased, a person will be considered legally dead if in the announced opinion of a physician, based on ordinary standards of medical practice, there is the irreversible cessation of all spontaneous brain function. Death will have occurred at the time when the relevant functions ceased.

(c) Death is to be pronounced before artificial means of supporting respiratory and circulatory functions are terminated.

question should not have been asked and the objection to it was properly sustained. The ground of error is overruled.

■ Appellant contends that the court erred in permitting Officer Evandon to testify that he heard Stockman tell his partner that appellant had raped her. Evandon and his partner arrived on the scene shortly after the shooting. His partner took Stockman out of appellant's car and handcuffed her. As they took her out of the car she said she had been raped. Evandon said she seemed upset.

The State argues that *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982) controls the issue and that Stockman's statement should be considered a rape victim's complaint or "outcry," or a spontaneous exclamation. We do not decide whether Stockman's statement constitutes either. Stockman testified on direct examination that she told the officer who took her out of the car that appellant had raped her. The error, if any, is harmless. Cf. *Brasfield v. State*, 600 S.W.2d 288, 296 (Tex.Cr.App. 1980).

■ Appellant claims that he should have been permitted to ask Evandon whether he "was aware that she [Stockman] took and flunked a polygraph test?" Earlier in the trial, during cross examination, appellant's attorney asked Stockman if one of the men who had questioned her had told her that he did not believe her story and had called her a "damn liar." Stockman asked defense counsel if he was "talking about the man who gave me a polygraph test?" Stockman denied that a redheaded man who had questioned her had called her a liar; she said the polygraph man had called her a liar.

Appellant contends that this earlier testimony by Stockman allowed him to question Evandon later about whether or not Stockman "took and flunked the polygraph test."

It has long been the rule in this State that the results of a polygraph test are inadmissible *for all purposes*. *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr.App.1981);

*Fernandez v. State*, 564 S.W.2d 771 (Tex. Cr.App.1978); *Romero v. State*, 493 S.W.2d 206 (Tex.Cr.App.1973). Even if the State and the defendant agree and stipulate to use the results of a polygraph at trial, we have held the testimony to be inadmissible. *Fernandez*, supra; *Romero*, supra. Stockman's unwittingly-made remark about a polygraph, does not mean that defense counsel, when examining a different witness, can ask that witness about the results of the polygraph. The testimony is not admissible and we have long held that to be the case. The ground of error is overruled.

■ In ground of error thirty-three appellant contends that photographs showing a bullet hole in the police car in which McCarthy and Brown were riding, were admitted without establishment of a proper predicate.

Officer Irby was in charge of investigating the murder. He arrived at the scene of the shooting at approximately 4:00 a.m. on February 23. The police car in which McCarthy and Brown had been riding was still there. Irby testified that he saw a bullet indentation on the left rear fender of the police car and that he ordered photographs taken of the indentation. Irby identified State's Exhibits 42 through 46 as photographs of the bullet indentation and stated that the photographs accurately portrayed the scene which they sought to portray.

Earlier in the trial Brown testified that prior to going on duty at 11:30 p.m. on February 22, 1981, he had inspected his police car and found that it was not damaged. In particular, there were no bullet dents or other dents in the left rear fender.

■ As long as the testimony shows that the photographs fairly and accurately depict the scene on the date of the offense, they are admissible. *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr.App.1979); *Stone v. State*, 574 S.W.2d 85 (Tex.Cr.App.1978). Irby sufficiently identified the photographs as accurate photographs of the car on the day of the shooting. The ground of error is overruled.

In another ground of error dealing with photographs, appellant contends that the court erred in admitting autopsy photographs of McCarthy. The photographs were taken immediately prior to the autopsy, and apparently show McCarthy's body, including the gunshot wound and some marks made by the doctors who tried to save his life.

The photographs are not included in the record on appeal. In "Appellant's Designation of the Record on Appeal" he requested that the original of all exhibits submitted into evidence be included in the record. The photographs were not included. However, appellant did not object to their omission pursuant to Art. 40.09, Sec. 7, V.A.C. C.P. Nothing is presented for review. *Vanderbilt v. State*, 629 S.W.2d 709 (Tex. Cr.App.1982); *Paige v. State*, 573 S.W.2d 16 (Tex.Cr.App.1978); *Lynch v. State*, 502 S.W.2d 740 (Tex.Cr.App.1973) (opinion on rehearing); *Weedon v. State*, 501 S.W.2d 336 (Tex.Cr.App.1973).

In his thirty-fourth ground of error appellant contends that the prosecutor violated Art. 38.22, V.A.C.C.P., and the Fifth Amendment to the United States Constitution. Defense counsel introduced appellant's statement, made to Investigator Irby, in which appellant stated, inter alia, that he was drunk and "[t]he next thing I remember is being out of the car and I guess I shot a police officer." The prosecutor questioned Irby about the statement and asked him if that was the entire conversation that Irby had with appellant at that time. Irby said that it was not. The prosecutor then started to question Irby about the content of the conversation. A hearing was held outside the presence of the jury and the court sustained appellant's objection to testimony concerning the content of conversation not included in the written statement. The jury returned to the courtroom and the prosecutor again asked Irby if the written statement was the entire conversation he had had with appel-

lant. Irby again replied that it was not. Appellant objected to this question and the court sustained the objection. Appellant now complains that this question violated his rights under Art. 38.22 and the Fifth Amendment.

Appellant's objection was sustained. He did not ask that the jury be instructed to disregard the testimony, nor did he move for a mistrial. Appellant must obtain an adverse ruling in order to preserve a matter for review. *Torres v. State*, 491 S.W.2d 126 (Tex.Cr.App.1973).[5] He received the relief he requested.

Appellant argues that a hypothetical question posed by the State to Dr. Lewis Dyll, a neurologist called by the defense, was not based upon evidence. Appellant does not specify how the hypothetical differed from the evidence, nor does our review of the record reveal any significant differences between Stockman's testimony and the hypothetical question. The question was based upon the testimony of the State's witnesses. See *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980). The ground of error is overruled.

In two grounds of error appellant complains of certain testimony by William Lawson, one of the State's rebuttal witnesses. Lawson was a planetarium instructor for the Garland Independent School District and a college instructor in the study of astronomy. He had several years of experience in the field of astronomy and had published, taught and studied about the subject.

Lawson testified that the early morning hours of February 23, 1981, were very bright. He said approximately 90% of the moon was illuminated, the sky was clear, and visibility was twelve miles.[6] Appellant objected to Lawson's testimony concerning weather conditions and visibility because Lawson was not an expert in meteorology and because his testimony was based on

---

5. Furthermore, we note that the same question had already been asked and answered without objection. Cf. *Brasfield*, supra.

6. Fifteen miles visibility is considered maximum visibility.

hearsay, namely, recorded information from the National Weather Bureau.

Lawson agreed that he was not a meteorologist, but he said the information from the National Weather Bureau was used by astronomers and recognized as an authoritative source of information by astronomers.

Appellant does not challenge Lawson's qualifications as an expert in astronomy. He challenges his answers regarding weather conditions and visibility on February 23, contending that because Lawson is not an expert in meteorology, his testimony is hearsay.

The rule in Texas is that an expert may base his opinion partially on facts or data not admissible as evidence if they are a type reasonably relied upon by experts in the field. *Holloway v. State*, 613 S.W.2d 497 (Tex.Cr.App.1981); *Moore v. Grantham*, 599 S.W.2d 287 (Tex.1980); *Urquhart v. Barnes*, 335 S.W.2d 666 (Tex.Civ.App.— Ft. Worth, 1960). Lawson testified that astronomers rely on the information from the National Weather Bureau. Lawson's opinion about the moon and the clearness of the night was based in part on data recognized and utilized by astronomers as authoritative, and in part on his own expertise in astronomy. Assuming that Lawson was a properly qualified expert in astronomy, then under the authorities cited previously his testimony is admissible. See *Lewis v. Southmore Savings Assoc.*, 480 S.W.2d 180 (Tex.1972). The ground of error is overruled.

In his fortieth ground of error appellant contends that the court erred in overruling his motion for mistrial when the prosecutor asked Officer Evandon whether appellant told him his name.

Evandon testified that he arrived on the scene shortly after the shooting. He advised appellant of his *Miranda* rights and transported him to the jail.

The prosecutor questioned Evandon about appellant's actions at the scene and asked Evandon whether he smelled alcohol or marijuana on or about appellant, and whether appellant had trouble walking or talking. Evandon said that he did not smell alcohol or marijuana and that appellant had no trouble walking or talking. Evandon testified that, in his opinion, appellant was sober.

The prosecutor then asked Evandon whether a defendant charged with an offense involving alcohol must consent before a blood test or breathalyzer test can be administered. Evandon said that was true. Then, apparently in an attempt to show appellant's lack of cooperation generally, and thus infer that he would not have consented to a test for intoxication if one had been offered, the prosecutor asked:

Q. Would this Defendant give you his address? Tell you where he lived?

A. No, sir.

Q. Would he give you his right name?

A. No, sir.

Appellant's objection was sustained and the jury was instructed to disregard the last question. The motion for mistrial was overruled.

Appellant is correct in asserting that his oral statements made while in custody, in response to questioning by the police are not admissible under Art. 38.22, Sec. 3, V.A.C.C.P. The court correctly sustained the objection to the question and instructed the jury to disregard the question. While the question should not have been asked, it is not so prejudicial or inflammatory that the instruction could not cure the error. From our review of the record we do not believe any harm resulted and the court's instruction was sufficient to cure the error. *Yarbrough v. State*, 617 S.W.2d 221 (Tex. Cr.App.1981); *Brem v. State*, 571 S.W.2d 314 (Tex.Cr.App.1978); *Seaton v. State*, 564 S.W.2d 721 (Tex.Cr.App.1978). The ground of error is overruled.

Appellant contends that during argument at the guilt-innocence phase of trial the prosecutor violated Art. 38.08, V.A.C. C.P., by commenting on appellant's failure to testify. The State argues that the com-

ment was a response to earlier argument made by counsel for appellant.

Defense Counsel argued:

The prosecutors, when they were questioning you, told you it's not up to the State to prove motive. That's right. Nothing in the Court's charge that says they have to prove it. But I'll say this: If you have lack of motive, you're certainly entitled to consider that. According to Brown, he'd finished. He was—both of them had finished. Turning to go to their car. And you've got a *man who knows* that he's facing two police officers with guns and gets out of the car and deliberately shoots and kills a policeman. *Where's the logic? What reason is there?*

The prosecutor then argued:

Motive. Mr. Goodwin wants a motive. Mr. Goodwin wants a reason. You told us, each and every one of you told us on voir dire that we could not, in many cases, bring you a motive or a reason and you agreed from that witness stand that you would not force the State to show you a motive. And I'm sure it was explained to you that we can't show you a motive or a reason because many times it is known only to the defendant. It's in that head (indicating Defendant). We can't cut open that head.

Defense counsel objected to the statement as a comment on appellant's failure to testify. The court sustained the objection, instructed the jury to disregard the statement and overruled appellant's motion for mistrial. The prosecutor then continued:

You know, in a case such as this where you have the cold-blooded, senseless shooting of a police officer, the motive or the reason—there may be no motive. Or reason. It may be just exactly as it appears. A senseless, motiveless killing with no reason. Just because it's the thing that the Defendant wants to do at the time. It doesn't make sense to you. Because you're not killers.

■ The four proper areas of jury argument are: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Todd v. State*, 598 S.W.2d 286, 296–297 (Tex.Cr.App.1980). In the instant case the defense attorney discussed motive in his argument to the jury. He told the jury essentially that the State had not shown any motive and that they should consider that lack of motive in deciding if appellant shot the police officer.[7] The prosecutor then responded to that argument about motive.

We have held that reference to motive is a comment on a defendant's failure to testify. *Lee v. State*, 628 S.W.2d 70 (Tex.Cr.App.1982); *Franks v. State*, 574 S.W.2d 124 (Tex.Cr.App.1978); *Koller v. State*, 518 S.W.2d 373 (Tex.Cr.App.1975); *Minton v. State*, 162 Tex.Cr.R. 358, 285 S.W.2d 760 (Tex.Cr.App.1956). However, in these cases the comments which were found to be reversible error were not made in response to argument by the defendant. In the instant case appellant's attorney started the discussion about motive. The State responded to that argument. The State's comment was invited by appellant's earlier argument, and as such does not constitute reversible error. *Broussard v. State*, 505 S.W.2d 282 (Tex.Cr.App.1974).

Furthermore, although the State's argument may have overemphasized the motive issue, we do not think that it exceeded the scope of the invited error. The jury had been informed of appellant's failure to testify through the defense attorney's argument about motive, as we have characterized such a comment to be. *Lee*, supra. The defense attorney referred to appellant's knowledge by stating that *appellant knew* he was facing two police officers. While the State may have pushed the point by referring to cutting open the defendant's head, the gist of the response was invited. See *Porter v. State*, 601 S.W.2d 721 (Tex.Cr.App.1980); *Broussard*, supra. Given the facts of the case, which reflect a

---

7. The defense attempted to imply that perhaps Brown shot McCarthy.

senseless killing by appellant, and given defense counsel's obvious insinuation in his argument that since no motive was shown perhaps appellant did not shoot the officer, the State's response to this invited argument was not error. The ground of error is overruled.

In ten grounds of error appellant argues that various requested charges should have been given to the jury at the guilt-innocence phase of trial.

Appellant argues that the evidence raised the issues of voluntary manslaughter, mistake of fact, self-defense, and defense of a third person.

■■■ There is no evidence from any source showing that appellant shot the police officer under sudden passion arising from adequate cause. There is no evidence of sudden passion as defined under V.T. C.A. Penal Code, Sec. 19.04. Neither Stockman's testimony nor appellant's statement reflect or suggest such passion. The instruction was properly refused. See *Bravo v. State*, 627 S.W.2d 152 (Tex.Cr. App.1982); *Luck v. State*, 588 S.W.2d 371 (Tex.Cr.App.1979).

■■■ Similarly, there is nothing that raises mistake of fact, self-defense or defense of a third person. The testimony indicates that Stockman told appellant that the men were police officers, that appellant saw the car and the uniformed officers, and that he knew they were police officers. Appellant argues that because he was naked and therefore somehow vulnerable, and because everything happened so fast, he could have believed that he was being attacked by an unknown assailant or that he had to protect Stockman from such attack. The evidence simply does not suggest such a scenario. None of the evidence presented raised the idea that appellant did not know the men were police officers and certainly nothing raised self-defense or defense of a third person. The charges were properly refused. See *Smith v. State*, 676 S.W.2d 584 (Tex.Cr.App.1984); *Knowles v. State*, 672 S.W.2d 478 (Tex.Cr.App.1984); *Montgomery v. State*, 588 S.W.2d 950 (Tex.

Cr.App.1979). The grounds of error are overruled.

■■■ Appellant also argues that his requested charges on aggravated assault on a police officer, deadly assault on a police officer, and aggravated assault should have been given. He argues that "the removal of the deceased from life support systems without properly following the procedures enumerated in Art. 4447T," was an intervening cause of death and justified the jury in considering that appellant was not guilty even of murder. As we stated previously, there is no evidence that the deceased was ever connected to life support systems. Furthermore, there is no evidence that appellant was guilty only of one of the three lesser offenses of assault. See *Broussard v. State*, 642 S.W.2d 171 (Tex.Cr.App.1982). The contentions are without merit.

■■■ Appellant contends that the trial court should have given his requested charge applying the law to the facts for the offense of capital murder. Appellant argues that the court did not charge the elements of capital murder in a proper manner. Appellant requested a rephrasing of the same elements on which the court charged the jury. The court's charge included all of the elements and correctly charged the jury that:

[I]f you believe from the evidence beyond a reasonable doubt that the Defendant ... did ... on or about the 23rd day of February, 1981, intentionally or knowingly cause the death of an individual, namely: J.T. McCarthy, a peace officer, to-wit: a police officer for the City of Dallas, by shooting the said J.T. McCarthy with a handgun, a deadly weapon, if it was, and the said J.T. McCarthy was then and there acting in the lawful discharge of an official duty, namely: investigation of a parked vehicle while the said J.T. McCarthy was on radio patrol, and the said Defendant then and there knew that the said J.T. McCarthy was a peace officer, if he was, then you will find the Defendant guilty of the offense of capital murder, as charged in the indictment.

The ground of error is overruled.

■ Appellant objected to the refusal of the court to instruct the jury that "parking in the place where the deceased [sic] was alleged to have parked, was not a violation of any ordinance or laws of the State of Texas." First, there is no evidence whether or not appellant was violating a law by parking where he did. Second, the indictment alleged that the lawful discharge of an official duty was investigation of a parked car and evidence was adduced to show that. There was no allegation either in the indictment or at trial that appellant was violating the law by parking where he did. In light of the allegation in the indictment and the proof at trial, appellant's requested charge was properly refused. It was of little consequence whether or not he was violating a law by parking at that location. The ground of error is overruled.

■ Finally, appellant complains of the court's failure to charge the jury:

that a witness may be impeached by showing that he or she has made other and different statements out of Court from those made before you on trial. Such impeachment evidence may be considered by you to aid in determining (if it does so) the weight, if any, to be given the testimony of a witness at trial and his or her credibility.

Appellant asserts, without citation to the record, that Stockman and Brown were both impeached by appellant's cross examination and that numerous statements contradicting their pre-trial interview or deposition were brought out. Appellant relies on *Henley v. State*, 387 S.W.2d 877 (Tex. Cr.App.1965) (opinion on rehearing).

Appellant does not specify to what "numerous impeaching contradictory statements" he is referring. Such contention does not comport with the requirements of Art. 40.09, Sec. 9, V.A.C.C.P.; *Cook v. State*, 611 S.W.2d 83 (Tex.Cr.App.1981).

Furthermore, as the State points out, the rule set forth in *Henley*, supra, is applied when the *State* impeaches their own witness with a prior statement. A limiting instruction explaining to the jury that the prior statement is not evidence protects a defendant from having the jury consider the State's impeachment of their own witness as evidence against the defendant. The same situation is not presented when a *defendant* impeaches the *State's witness*. If a court refuses a defendant's request for an instruction limiting the jury's consideration of impeaching testimony brought out by a defendant of a State's witness, the rationale of *Henley* does not apply. See *Henley*, supra, at 881–882. The ground of error is overruled.

■ We turn now to the punishment phase of the trial. Appellant challenges the sufficiency of the evidence to prove beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. See Art. 37.071(b)(2), V.A.C.C.P.

A review of the facts of the instant offense, show the cold-blooded, senseless shooting of a police officer who, with his partner, had simply told appellant and his companion to leave the area. The evidence also shows that earlier in the evening, appellant had threatened Stockman with a gun.

Two reputation witnesses who had known appellant when he lived in his hometown of Soddy-Daisy, Tennessee, testified that he had a reputation for being violent and dangerous. Two psychiatrists testified that appellant was a sociopath who would probably commit future criminal acts of violence and would constitute a continuing threat to society.

Maurice Dean Sneed, one of the reputation witnesses who testified that appellant had a bad reputation for being dangerous and violent, testified that he had grown up with appellant in Soddy-Daisy. He said that appellant had a juvenile record, had thrown rocks at police officers, violated curfew, hit other people in the community with bats, bricks and sticks, and shot at them with a BB gun. He also said that appellant had assaulted a police officer.

Two police officers from the city of Addison testified about appellant's arrest for a burglary at a construction site in January, 1980. The arresting officer told appellant to stop where he was when he saw him at the site. Appellant ignored him and walked over toward the passenger door of his car. The officer reached him just as appellant got to the door. A shotgun was sitting on the front seat.

When appellant was being "booked" at the police station he refused to cooperate with the police, cursed them, and fought with them until he was forcibly subdued.

As a result of the burglary appellant was placed on probation for four years. After six months he stopped reporting to his probation officer.

Gregory Teshy and Sherri Woodall testified that on August 20, 1980, appellant approached their car, opened the passenger door, pointed a shotgun at them, and demanded their money. When Teshy argued, appellant told him he would kill him if he did not give him the money.

When the facts of the instant offense are considered with the additional evidence of violence and threatened violence on the part of appellant, including the robbery, the burglary and ensuing arrest, the psychiatric testimony and the reputation testimony, we conclude that the evidence is sufficient to support the jury's finding as to appellant's future dangerousness under Art. 37.071(b)(2). See *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983); *Bravo v. State*, 627 S.W.2d 152 (Tex.Cr.App.1982); and *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr.App.1981).

■ Appellant objected to the testimony of Maurice Dean Sneed "because his testimony as to bad character for being peaceful and law abiding did not pertain to the place where the Defendant resided." This constitutes appellant's entire discussion under this ground. Although we are uncertain exactly of what appellant complains, we interpret his contention to go to the remoteness of the time at which Sneed became familiar with appellant's reputation.

Sneed testified that he had known appellant all of his life and had grown up with him in Soddy-Daisy, Tennessee. Appellant left Soddy-Daisy at the age of eighteen, two or three years prior to the murder. Sneed testified that appellant's reputation in Soddy-Daisy for being a peaceful, law-abiding citizen was bad.[8]

■ For impeachment purposes the prior character of a defendant for being peaceful and law abiding, like that for being truthful, is some evidence of what his present character is. Thus, testimony regarding prior character is admissible if it is not so remote as to have no probative value in indicating present character. See 1 R.Ray, Texas Law of Evidence Civil and Criminal, Secs. 650–651 (Texas Practice, 3rd Ed.1980), and cases cited therein. McCormick on Evidence, Sec. 44, (3rd Ed. 1984). The question of remoteness, consistent with impeachment practices, rests in the discretion of the trial court. *Brown v. Perez*, 89 Tex. 282, 34 S.W. 725 (Tex.Cr. App.1896); *Jenkins v. State*, 146 Tex.Cr.R. 364, 175 S.W.2d 83 (1943). *Davis v. State*, 545 S.W.2d 147 (Tex.Cr.App.1976).

The jury would be deciding "whether there is a probability that [appellant] would commit criminal acts of violence that would constitute a continuing threat to society." Evidence of appellant's past acts and reputation may be introduced to assist the jury in answering that question. The trial court did not abuse its discretion in permitting Sneed to testify to appellant's reputation. Sneed had known appellant all his life and appellant had only been gone from Soddy-Daisy for two or three years. Appellant was free to offer reputation witnesses to counter such testimony.

■ In addition, objections based upon remoteness go to the weight, not the admissibility of the testimony. *Sanne v.*

---

**8.** We note that appellant did not object to the reputation testimony of witness Mark Ralston, who also testified that he knew appellant from Soddy-Daisy.

*State,* 609 S.W.2d 762 (Tex.Cr.App.1980). The ground of error is overruled.

In his 42nd ground of error appellant contends, without stating any reasons for his contention, that the prosecutor asked an "improper character question." The prosecutor questioned Mark Ralston, a police officer for the City of Soddy-Daisy, about appellant's reputation for being peaceful and law abiding. He then asked Ralston if he knew appellant's reputation for being dangerous and violent. Appellant objected to this question.

 Past acts, prior convictions, reputation and other evidence the court deems relevant may be presented at the punishment phase of a capital murder trial. See Art. 37.071(a), V.A.C.C.P.; see also *Mitchell v. State,* 650 S.W.2d 801 (Tex.Cr. App.1983); *Russell v. State,* 665 S.W.2d 771 (Tex.Cr.App.1983). Although the common practice has been for the State to ask the reputation question in terms of "peaceable and law abiding," the reputation question phrased essentially in converse fashion —"dangerous and violent"—is also permissible. The ground of error is overruled.[9]

 Appellant's next ground also deals with the witness Ralston. The defense attorney asked Ralston if "he knew" that appellant was involved in his church and if "he knew" whether appellant went to Vacation Bible School. The prosecutor picked up this line of questioning:

Q. Well, do you know that he was involved in his church at one period of time?

A. It was rumored so.

Q. All right. Up until his daddy bought him a new car, and then he quit?

A. That was the rumor that I heard.

At this point appellant's objection was sustained.

The prosecutor then asked:

Q. Is that a fact?

A. That was as it was told to me.

Appellant objected and asked that the jury be instructed to disregard the question and answer, which was done by the court. His motion for mistrial was overruled.

 A reputation witness testifies on the basis of hearsay information, not personal opinion. *Brown v. State,* 477 S.W.2d 617 (Tex.Cr.App.1972). The witness made clear that the information was rumor and hearsay, not personal knowledge. This does not make it improper information in the context of reputation testimony. See *Brown,* supra. The prosecutor should not have phrased his question in terms of "fact." However, any error in so doing was cured by the court's instruction to disregard and by Ralston's answer that he was told by another about the church issue. It was clear from Ralston's answer that his knowledge was based upon hearsay. The ground of error is overruled.

 Appellant contends that Officer Linda Fulgham should not have been permitted, over his objection, to testify to appellant's bad reputation. Appellant states that Fulgham's testimony that she learned about appellant's reputation after the instant offense and that her knowledge "grew out of his arrest" for the instant offense disqualified her from testifying.

Fulgham said she had learned about appellant's reputation after the instant offense. She also stated that she had heard about a burglary and a robbery committed by appellant. She further stated that she had discussed appellant's general reputation with members of the community, both police officers and civilians.

 Discussions of an accused's bad reputation need not take place before the date of the alleged offense, as long as they include matters other than the crime for which the accused was on trial. *Mitchell v. State,* 524 S.W.2d 510 (Tex.Cr.App.1975). Knowledge of specific acts alone as a basis for reputation testimony violates the rationale for admitting such testimony. *Wagner v. State,* 687 S.W.2d 303 (Tex.Cr.

---

9. Ground of error number 47 complains of the same question asked of another witness. We overrule that ground on the same basis as the instant one.

App.1985) (opinion on rehearing). General reputation testimony is admissible even if it is partially based on discussions of the offense for which the appellant is being tried, as long as it is also based on a discussion of matters other than the instant offense. *Jackson v. State,* 628 S.W.2d 446 (Tex.Cr. App.1982).

Fulgham testified that she had discussed appellant's general reputation with others in the community. She was qualified to testify to appellant's reputation. *Mitchell,* supra.

The ground of error is overruled.

▮▮▮ In two grounds of error appellant contends that the trial court erred in allowing testimony about the details of a prior burglary, for which he received a probated sentence, and a prior unadjudicated robbery committed by appellant. He claims that admitting such testimony under Art. 37.071(a), V.A.C.C.P., in a capital murder trial, while not admitting it in a trial where Art. 37.07, V.A.C.C.P. applies, violates equal protection. An identical contention was raised and rejected in *Smith v. State,* 683 S.W.2d 393 (Tex.Cr.App.1984). We have consistently held that evidence of unadjudicated extraneous offenses are admissible at the penalty stage of a capital murder trial absent a showing of unfair surprise. *Smith v. State,* 683 S.W.2d 393 (Tex.Cr.App.1984); *Quinones v. State,* 592 S.W.2d 933 (Tex.Cr.App.1980); *Crawford v. State,* 617 S.W.2d 925 (Tex.Cr.App.1980). Admission of these offenses does not render proceedings fundamentally unfair or deprive an accused of due process or equal protection of the laws. *Smith,* supra; *Williams v. State,* 622 S.W.2d 116 (Tex.Cr. App.1981).

The grounds of error are overruled.

▮▮▮ Appellant contends the court erred in permitting two psychiatrists to testify, over objection, to appellant's future dangerousness. Art. 37.071(b)(2). His contention is based, inter alia, upon the failure of the State to qualify these witnesses as experts in predicting future dangerousness or to show that their predictions would be based upon scientifically accepted principles. Appellant contends that the prediction of future dangerousness is not an exact science, is too speculative, and has no scientific basis.

At the pre-trial hearing on the issue of expert qualifications, appellant read from and now relies in his brief upon the criteria set forth in *Holloway v. State,* 613 S.W.2d 497 (Tex.Cr.App.1981). In *Holloway* this Court held that the burden of proving the qualifications of an expert witness lies upon the proponent of the testimony. That burden may not be met merely by showing professional credentials in a calling which relates to the matter in question. Special knowledge of the specific matter upon which the expert is to testify must be shown. Further, " 'even though a witness' qualifications as an expert may be established or admitted, his opinion may be inadmissible if there is no evidence of technical or scientific support for it.' " *Holloway,* supra at 501.

Dr. James Grigson testified that he specialized in psychiatry, and he detailed his educational and work background. He said that he had examined over 10,000 individuals charged with criminal offenses, including over 850 charged with murder and 120 charged with capital murder. During cross examination Grigson admitted that in every capital murder case in which he had testified about future dangerousness he had testified in the affirmative.

He said he was competent to give his opinion based upon a hypothetical question because of his medical and psychiatric training, and his experience in examining murder and capital murder defendants over the past sixteen years. When asked if he could cite any medical authority or research that states that a psychiatrist is competent to testify based solely on a hypothetical question, Grigson said he was probably the best authority on that area. He then cited two articles which he said stated that the best indication of future acts of violence are a history of prior acts of violence in the past.

Grigson admitted being familiar with the brief filed by the American Psychiatric Association, in a Supreme Court case, involving his testimony, *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) in which the association said that making a prediction of future violent behavior is beyond psychiatry and verges on quackery. Grigson was not familiar with several other articles dealing with the prediction of violence. Grigson also stated that he was 100% accurate in his predictions of future violence and that he based his answers to hypotheticals on the facts given in the hypothetical.

Grigson qualified as an expert under the requirements set out in *Holloway*, supra, because he demonstrated that, based on his experience and on a couple of articles supporting his view, "he possessed special knowledge" in the area of predicting future violence.

Appellant's contention that a psychiatrist's testimony on the issue of future dangerousness in the form of a hypothetical question should not be permitted was addressed and overruled by this Court in *Vanderbilt v. State*, 629 S.W.2d 709 (Tex. Cr.App.1981); and *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980). The United States Supreme Court also addressed the issue of psychiatric testimony in *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983):

> The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel. In the first place, it is contrary to our cases. If the likelihood of a defendant committing further crimes is a constitutionally acceptable criterion for imposing the death penalty, which it is, *Jurek v. State*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and if it is not impossible for even a lay person sensibly to arrive at that conclusion, it makes little sense, if any, to submit that

psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify.

\* \* \* \* \* \*

> .... Psychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case but as generally so unreliable that it should be ignored. If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors. (footnote omitted)

*Barefoot v. Estelle*, 103 S.Ct. at 3396 & 3397.

The grounds of error are overruled.[10]

Appellant contends that the hypothetical question posed to Drs. Grigson and Griffith contained statements which were not part of the evidence and that the doctors should not have been permitted to answer it.

> Although a hypothetical question must be based on the facts of the case, counsel may assume the facts in accordance with his theory of the case. If the opponent desires to secure the expert's opinion upon a different set of facts he may do so on cross-examination. (citations omitted).

*Barefoot v. State*, 596 S.W.2d 875, 887–888 (Tex.Cr.App.1980), affirmed 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

Of the six facts of which appellant complains, five were supported by the evidence. The one fact of which appellant complains—that "the same man was in the car covering his arm while in the car," was not included in the hypothetical question posed to either Grigson or Griffith. The grounds of error are overruled.

---

10. At trial appellant objected to the testimony of Dr. Clay Griffith on the same grounds as those objected to for Dr. Grigson. In his brief appellant discusses only Dr. Grigson specifically. Griffith's qualifications as an expert on predicting future dangerousness in terms of education, training and experience with criminal defendants, are similar to Grigson's.

█ The State called Dr. Grigson to testify as a rebuttal witness at the punishment phase of trial. During cross examination Grigson testified that the first time he heard the State's hypothetical question "in its completeness" was at trial. Appellant then questioned Grigson:

Q. Well, you mean the State just guessed that you were going to answer them the way they wanted you to without ever giving you the hypothetical before you got up there?

A. No. I don't think I answered it the way they wanted me to. I think that they were aware, at least from what they said, that this was one of the worst people they'd ever seen and—

Appellant objected that the remarks were outside the scope of the answer, and asked that the jury be instructed to disregard the remarks. The court sustained the objection and instructed the jury. Appellant's motion for mistrial was overruled.

We agree with appellant that the answer was not responsive and that Grigson also knew from a pre-trial instruction, that he should not have answered in such a fashion. However, Grigson also testified that in his opinion appellant was a "severe sociopath." Dr. Griffith had also testified that appellant was a sociopath who would get worse. In light of this evidence and the instruction to disregard, the motion for mistrial was properly overruled. See *Wilhoit v. State*, 638 S.W.2d 489 (Tex.Cr.App. 1982); *Richardson v. State*, 624 S.W.2d 912 (Tex.Cr.App.1981).

█ Benjamin Hal Nethery, appellant's father, testified at the punishment phase of trial. During cross examination of Nethery, the prosecutor elicited the information that Nethery was paying for his son's lawyers, for the psychiatrist, and for the psychologist who testified for the defense. He asked Nethery if he thought it unusual that a psychiatrist and psychologist for whom he paid did not even examine appellant. Then he asked Nethery if he understood that if the psychiatrist and psychologist had examined appellant, the State would have had a right to have him examined. Appellant objected: "that calls for a question of law." The objection was sustained. The jury was instructed to disregard it and appellant's motion for mistrial was overruled.

On appeal appellant contends that the prosecutor's question violated appellant's fifth Amendment right to remain silent during psychiatric examination as set forth in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Appellant's contention on appeal does not comport with his objection at trial. The issue is not preserved for review. *Stringer v. State*, 632 S.W.2d 340 (Tex.Cr.App.1982); *Darden v. State*, 629 S.W.2d 46 (Tex.Cr.App.1982); *Carrillo v. State*, 591 S.W.2d 876 (Tex.Cr. App.1979).[11]

█ In a multifarious ground of error appellant complains of the charge to the jury on punishment. Appellant requested instructions that the burden of proof rests upon the State; that before any issue may be answered "yes", all jurors must be convinced beyond a reasonable doubt; that if the jury unanimously determines that the State has proven an issue beyond a reasonable doubt, the foreman will sign his name to the form to so reflect; that any juror who has reasonable doubt should vote "no", and that if the jurors do not unanimously vote "yes" or at least ten in favor of "no", then no answer should be given and the foreman should not sign his name. Appellant requested that a form be given to the jury stating that "because at least ten jurors have a reasonable doubt as to the matter inquired about in this special

11. In addition, we note that despite the fact that appellant's objection was sustained, defense counsel later asked Nethery if they had not told him that appellant was not examined because they *did not* think he was crazy. The prosecutor then again asked if the defense attorneys had not also informed Nethery that if they had him examined the State would have a right to do so. Nethery replied that possibly defense counsel did indeed tell him that. The error, if any, of the initial question was cured by defense counsel's inquiry into his conversation with Nethery concerning the psychiatrist.

issue find and determine that the answer to this special issue is 'no'."

The charge as given included substantially all the requested instructions. Appellant's requested form was properly refused. The ground(s) of error are overruled.

Appellant also objected to the court's definition of temporary insanity caused by intoxication, contending that it was not complete. His requested definition was denied.

> The court's charge to the jury stated: Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried. 'Intoxication' means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

The court refused appellant's requested charge that: " 'insanity' as used herein means 'that as a result of intoxication the Defendant either did not know that his conduct was wrong or he was incapable of conforming his conduct to the requirements of the law he allegedly violated.' "

While the court's charge tracked V.T.C.A. Penal Code, Sec. 8.04 correctly, we agree with appellant that it should have included a definition of "insanity" as it applies to Sec. 8.04. "Insanity" as applied under Sec. 8.04 is not the same as that defined by the entire section of V.T.C.A. Penal Code, Sec. 8.01. Rather, it means that as a result of intoxication the defendant (1) did not know his conduct was wrong or (2) was incapable of conforming his conduct to the requirements of the law he violated. *Hart v. State*, 537 S.W.2d 21 (Tex.Cr.App.1976); V.T.C.A. Penal Code, Sec. 8.04, Practice Commentary; see also

V.T.C.A. Penal Code, Sec. 8.01(a) in part only.[12] If such a charge is necessary, the jury should be given definitions of "intoxication" under Sec. 8.04, and "insanity" under the applicable part of Sec. 8.01 and as defined in *Hart*, supra, as applied to Sec. 8.04. Without both definitions, they cannot adequately evaluate the evidence and apply the law.

However, in the instant case, the failure of the court to so charge is not error because the evidence did not raise the issue and no charge was required.

Evidence of appellant's intoxication on February 22 and 23, came from Carol Stockman, Officer Brown and Investigator Irby. Stockman said appellant drank three "kamikaze" drinks in her presence and shared a marihuana cigarette with her. She said he did not act or appear to be intoxicated at any time. She was with appellant for several hours.

Brown testified that appellant shot three times over the car, hitting McCarthy in the head with one of the shots. Appellant then ran more than eighty yards to the lake, at night, dodging trees, picnic tables and barbecue grills. Brown testified that he was in good physical condition and that he could not catch up with appellant. In fact, he testified that appellant managed to bring his handcuffed arms from behind his back to the front of his body several times— something that is fairly difficult to do when one is sober.

Irby testified that he took a written statement from appellant after his arrest. In his statement, appellant said that he remembered drinking beer, whiskey, and vodka, and he remembered smoking some marihuana. He remembers driving and stopping near some water, and trying to

---

12. Sec. 8.01, as it read at time of appellant's trial, states:
 (a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of mental disease or defect, either *did not know that his conduct was wrong or was incapable of conforming his conduct to the requirement of the law he allegedly violated.*

 (b) The term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
 The underlined part is the only part of Sec. 8.01 applicable to a definition of temporary insanity due to intoxication.

make love to Stockman and having difficulty. "The next thing I remember is being outside the car and I guess I shot a police officer. I remember being naked and running into the water." Even this statement, while it reflects that appellant was drinking, does not necessarily show intoxication.

Appellant was not entitled to a charge on temporary insanity caused by intoxication. The inclusion of the general charge on intoxication under Sec. 8.04 could only benefit appellant. No error is presented.

The ground of error is overruled.

■ The trial court overruled appellant's motion to sequester the jury during the entire trial, because of publicity about the case. The court admonished the jurors daily not to discuss the case, read the papers, watch television or listen to the radio concerning the case. During the punishment phase of the trial the court questioned each juror individually about whether they had followed his instructions generally and whether they had read a particular newspaper article concerning the case. Two jurors had heard the beginning of a radio newscast concerning a witness in the case but had immediately turned off the radio. The rest of the jurors had not heard or read anything about the case.

■ Whether to grant a motion to sequester the jury is a matter within the discretion of the trial court. Art. 35.23, V.A.C.C.P.; *Evans v. State,* 622 S.W.2d 866 (Tex.Cr.App.1981). Absent a showing of harm, there is no abuse of discretion in failing to sequester the jury. *Evans,* supra; *Creel v. State,* 493 S.W.2d 814 (Tex.Cr.App.1973).

In the instant case the jurors followed the court's instructions. No harm is shown. The ground of error is overruled.

■ In his last ground of error, without any discussion or citation of authority, ap-

pellant attacks the constitutionality of Art. 37.071, V.A.C.C.P. The ground is overruled. *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr.App.1980); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).[13]

The judgment is affirmed.

CLINTON, J., concurs in the result.

---

13. In his *pro se* brief appellant alleges ineffective assistance of counsel on appeal because counsel failed to cite authority and failed to discuss the contention for thirty-seven out of fifty-five alleged grounds of error. We agree that counsel's brief was severely deficient in this respect. However, because we were able to

identify and understand the grounds and because we thoroughly reviewed each ground on our own, we overrule appellant's contention. However, there is no excuse for an attorney who has received several extensions of time in which to file a brief to present to this court a brief such as the instant one.