Affirmed and Memorandum Opinion filed May 28, 2009








Affirmed
and Memorandum Opinion filed May 28, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-01071-CR

____________

 

GLEN ALLAN SHELTON, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 185th
District Court

Harris County, Texas

Trial Court Cause No. 1081659

 



 

M E M O R A N D U M   O P I N I O N

Appellant Glen Allan Shelton was charged with capital
murder.  A jury found him guilty and assessed punishment at life in prison.  In
five issues, he contends (1) the trial court erred in overruling his objection
to the prosecutor=s opening statement, (2) the evidence is
legally insufficient to support his conviction, (3) the trial court erred in
sustaining the State=s objections to voir dire questions, and
(4) the trial court erred in overruling Shelton=s objections to
voir dire questions.  We affirm.

Background

On August 13, 2006, the complainant, Noemi Pham, was
discovered burned to death in her home.  Arson investigators detected a strong
odor of gasoline in the home and determined the fire had been intentionally
set.  They determined the origin of the fire to be the master bedroom where
Pham=s body was found. 
Pham=s family members
identified Shelton as a potential suspect, and he voluntarily gave a statement
to the Harris County Sheriff=s Office.  As he was leaving the sheriff=s office, Shelton
showed Sergeant M. D. Holtke a text message he had received from Pham at 12:55
the morning of the fire.  The text message stated: 

We ain=t got to understand each other. 
All that needs to be understood is that we are through.  I=m through and we don=t need to be communicating.  Fuck
the bullshit.  You think you=re attractive to me with all that=s going on with you plus your bullshit?  You gotta be
kidding me.  Let those bitches know and you=ll see how many of them are down.  You ain=t even worth a damn.  Fuck you and
stop calling.  Don=t make me change my number.

 

Sergeant
Holtke also retrieved mobile-phone records and voicemail messages from Pham=s phone, and
learned that she and Shelton exchanged several phone calls in the hours before
she was killed and her house was set on fire.








Sergeant Breck McDaniel of the Houston Police Department
specializes in mobile-phone records, and testified that reviewing such records
he was able to track Shelton=s movements the night Pham was killed. 
Sergeant McDaniel explained that Acell sites@ are antenna
panels, commonly referred to as Acell towers,@ which are used to
process telephone calls, text messages, and other communication events sent
from mobile phones.  Cell-site records typically reveal the approximate
location of a cellular telephone at the beginning and end of a Acommunication
event.@[1]  The records do
not indicate where the phone was during the event, but logical assumptions can
be made.  ACell sectors@ used to locate a
mobile phone are approximately two square blocks.

Following Shelton=s movements
through the use of his mobile phone, Sergeant McDaniel determined that between
11:37 p.m. and 11:46 p.m. on August 12, 2006, the night before the fire,
Shelton was in a sector in the Galleria area of Houston.  This was consistent
with other witnesses who placed Shelton at a bar called the Buddha Lounge in
the Galleria area.  From the Galleria area, Shelton traveled to his home where
he remained for about one hour and thirty-nine minutes.  Shortly after
receiving Pham=s text message, Shelton called her to explain his
behavior at a wedding they had both recently attended.  Pham=s friends
testified that she had argued with Shelton about attention he had given to
other women at the wedding.  At 12:57 a.m., Shelton left a series of messages
stating, AI went to Nicky=s wedding. I didn=t dance with
nobody.@  AYou=re up there in my
face in all the pictures with your arms around other dudes.@  AYou=re in pictures all
over the . . . internet with other guys.@  AYou=re immortalized. 
Everybody sees those pictures.@  ADon=t sit there and
argue with me over a text.@  Shelton left another message at 1:10
a.m. stating, AI didn=t even dance with any girls, but you go
out and do this all the time.@  AIf anybody has a
right to be mad, it=s got to be me.@  At 1:13 a.m.,
Shelton left a message stating, AAnd doing it in
front of my face when I=m there with you on the cruise.@  At 2:48 a.m.,
Shelton stated, APick up the phone, I=m gonna call you,
I=m gonna come over
there.@








Between 2:50 a.m. and 2:57 a.m., there were four
communication events from Shelton=s phone as it was
moving north away from his residence toward Pham=s residence. 
Between 2:57 a.m. and 2:58 a.m., there were three communication events as
Shelton continued to travel north.  Reviewing the cell sites on a map, Sergeant
McDaniel determined that Shelton was traveling north on Highway 6, consistent
with driving from his home to Pham=s home.  The last
communication event prior to the fire was at 2:59 a.m. with Shelton still
traveling north. 

Officers responding to the fire found that the master
bedroom was completely destroyed and the origin of the fire was the bed where
Pham=s body was found. 
Investigators also determined that gasoline had been poured throughout the
house, but had not ignited in the other rooms because the door to the master
bedroom had been closed.  Gasoline had been poured on Pham=s luggage, which
she had taken on a recent cruise with her friends and Shelton.  Gasoline had
also been poured on several photographs from the cruise.

Morna Gonsoulin, an assistant medical examiner for Harris
County, testified that the positioning of Pham=s body was not
typical of someone who dies in a house fire.  Usually, when someone has
suffered extensive burns, even in a vehicle while wearing a seatbelt, the
muscles in the front of the body and the muscles that connect the torso to the
arms and legs will get shorter as they lose moisture, causing the body to pull
downward into an extreme fetal position.  Pham=s body, however,
was found lying flat with the legs bent backward toward her back.  This position
strongly suggests that the body was bound during the fire.  Pham also had smoke
particles in her lungs, which means that she breathed for a short time after
the fire was set.  Gonsoulin testified that it is unlikely that an individual
who is alive would lie in a burning house unless she were incapacitated in some
manner.  Toxicology screens showed that Pham had alcohol in her system, but her
blood-alcohol level was below the legal limit and she had no narcotics or other
drugs in her system that would cause her to be incapacitated.  Gonsoulin
classified the death as Ahomicidal violence@ because the
autopsy findings did not show how she was incapacitated, but the evidence was
highly suggestive that she was incapacitated before the fire was set.

Shelton was convicted of capital murder and sentenced to
life in prison.

Opening Statement








In his first issue, Shelton argues that the trial court
erred in overruling his objection to the prosecutor=s reference to a
polygraph examination during opening statement.  The prosecutor explained to
the jury what the evidence would show with regard to the investigation into
Pham=s death.  In that
regard, the prosecutor commented:

The officers started looking at
relationships, who she had relationships with, and they learned that she had
been married and she has a child, [N. P.].  They looked at the ex-husband to
determine whether or not he was, in fact, involved; questioned him.  He agreed
to cooperate fully with the officers, submitted to a polygraph.  The officers
ruled him out as a suspect.

Shelton
objected to the prosecutor=s comment, arguing that evidence that
anyone took a polygraph examination is inadmissible.  The trial court overruled
the objection and denied Shelton=s request for a
mistrial.

Polygraph results are not admissible for any purpose in a
criminal case.  Nethery v. State, 692 S.W.2d 686, 700 (Tex. Crim. App.
1985).  With respect to the prosecution=s opening
statement in a jury trial, Code of Criminal Procedure article 36.01(a)(3)
provides that A[t]he State=s attorney shall
state to the jury the nature of the accusation and the facts which are expected
to be proved by the State in support thereof.@  Tex. Code Crim.
Proc. Ann. art. 36.01(a)(3) (Vernon 2007).  The trial court erred in overruling
appellant=s objection to the State=s assertion that
the complainant=s ex-husband submitted to a polygraph.  See
id.; Nethery, 692 S.W.2d at 700.  This error is subject to a
non-constitutional harm analysis.  See Tex. R. App. P. 44.2(b); Mosley v. State, 983 S.W.2d
249, 259 (Tex. Crim. App. 1998).  In analyzing whether this improper statement is so harmful
that the case must be retried, we consider (1) the severity of the misconduct
(the magnitude of the prejudicial effect of the prosecutor=s remarks), (2) measures adopted to
cure the misconduct (the efficacy of any cautionary instruction by the judge),
and (3) the certainty of conviction absent the misconduct (the strength of the
evidence supporting the conviction).  See Mosley, 983 S.W.2d at
259. 








As to the severity of the misconduct, the prosecutor could
not reasonably have expected to prove that the complainant=s ex-husband submitted
to a polygraph.  We cannot determine from the record whether the prosecutor
intentionally referred to the polygraph examination; however, we presume for
the purposes of our analysis that she did.  Regarding the magnitude of the prejudicial
effect of the prosecutor=s remarks, Shelton argues that the prosecutor=s comment had the
effect of impeaching his defensive theory and bolstering the State=s case.  The
record reflects that the results of the polygraph test were not admitted before
the jury.  The prosecutor commented that the ex-husband had been eliminated as
a suspect after full cooperation with authorities including submitting to a polygraph
test.  The peace officer who testified about the ex-husband=s cooperation did
not mention a polygraph, nor was he asked about a polygraph examination.  The
peace officer testified that he ruled out the ex-husband as a suspect.  Though
Shelton argues that the prosecutor=s improper comment
undermined his defensive theory that the complainant=s ex-husband
committed the offense in question, the record does not reflect that Shelton
asserted this defensive theory at trial.[2] 
He did not argue at trial that the complainant=s ex-husband may
have committed the offense. A homicide investigator testified that, after
talking to the ex-husband and investigating him as a potential suspect, the
investigator no longer considered him a possible suspect.  In his testimony,
the officer made no statement or suggestion that Shelton had taken a polygraph
examination.[3] 
On this record, we conclude that the prosecutor=s remarks did not
have a significant prejudicial effect.[4]

Unlike many cases involving reference to polygraph
examinations, in the case at hand, the trial court did not specifically
instruct the jury to disregard the prosecutor=s statement.  But
in the charge, the trial court did instruct the jury not to consider, discuss,
or relate any matters not in evidence.  In the absence of evidence to the
contrary, we presume that the jury followed this instruction.  See Miles v.
State, 204 S.W.3d 822, 827B28 (Tex. Crim. App. 2006). 

As to the certainty of conviction absent the misconduct and the strength of the
evidence supporting the conviction, as explained in more detail below, there
was substantial circumstantial evidence of Shelton=s guilt.  








After weighing all of the relevant factors, we conclude
that appellant=s rights were not substantially affected by the
prosecutor=s mention of the polygraph examination during opening
statement and that the trial court=s error in
overruling appellant=s objection was harmless.[5] 
See Tex. R. App. P. 44.2(b); Charles v. State, 424 S.W.2d 909,
913 (Tex. Crim. App. 1967) (stating that reference to the taking of a polygraph
test by people other than the defendant does not constitute reversible error); Stewart
v. State, 705 S.W.2d 232, 234  (Tex. App.CTexarkana 1986,
pet. ref=d) (concluding
that testimony indicating that suspect other than defendant took a polygraph
examination was harmless due to other evidence showing why that other person
was cleared as a suspect).  Shelton=s first issue is
overruled.

Sufficiency of the Evidence

In his second and third issues, Shelton claims the evidence
is legally insufficient to support his conviction.

A.      Standard
of Review

In a legal-sufficiency review, we view all the evidence in
the light most favorable to the verdict and determine whether a rational trier
of fact could have found the essential elements of the offense beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Bigon
v. State, 252 S.W.3d 360, 366 (Tex. Crim. App. 2008).  The trier of fact is
the exclusive judge of the credibility of witnesses and of the weight to be
given to their testimony.  Mosley v. State, 983 S.W.2d 249, 254 (Tex.
Crim. App. 1998).  Likewise, reconciliation of conflicts in the evidence is
within the exclusive province of the fact finder. Id.  We must resolve
any inconsistencies in the testimony in favor of the verdict.  Curry v.
State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  If any rational trier of
fact could have found the crime=s essential elements beyond a reasonable
doubt, we must affirm.  McDuff  v. State, 939 S.W.2d 607, 614 (Tex.
Crim. App. 1997). 

B.      Intent to
Commit Murder in the Course of Arson

In his second issue, Shelton argues that the State failed
to prove beyond a reasonable doubt that the complainant was intentionally
murdered in the course of an arson being committed.  Shelton contends that
rather than proving murder occurring in the course of committing arson, the
State merely proved murder by arson.  








A person commits capital murder if he intentionally or
knowingly causes the death of an individual in the course of committing or
attempting to commit arson.  Tex. Penal Code Ann. ' 19.03(a)(2)
(Vernon 2003 & Supp. 2008).  Shelton argues that because Pham died as a
result of the fire, the State failed to prove that a murder occurred Aseparate and apart
from the arson.@  Capital murder by arson occurs only when
the appropriate mens rea is satisfied: an intent to murder and an intent to
destroy or damage the owner=s building without the effective consent
of the owner.  Hogue v. State, 711 S.W.2d 9, 13 (Tex. Crim. App. 1986).

In this case, there is legally sufficient evidence of two
intentsCan intent to
murder Pham and an intent to destroy or damage the house.  The arson
investigator testified  that the AV@ shaped burn
pattern on the wall at the head of the bed along with the smoke pattern on the
outside of the middle bedroom window indicated that the bed in the master
bedroom was the area of the fire=s origin.  The
investigator detected an overwhelming odor of gasoline in the living room
emitting from the back wall, the couch, and near the television indicating that
Shelton intended to burn the entire house.  Because the bedroom door was
closed, the fire did not travel from the bedroom to the rest of the house, and
so the house did not completely burn.  The investigator also found gasoline had
been poured on Pham=s luggage, which was stored in the dining
room, and on photographs of Pham on the cruise vacation she had taken with
Shelton.  

The assistant medical examiner testified that the body was
discovered, not in an extreme fetal position as is typical in a death by arson
case, but flat with the feet bent backward, indicating that Pham had been
restrained prior to the fire being set.  The medical examiner further testified
that there was no evidence that Pham attempted to escape such an intense fire,
also indicating that she was restrained.  Viewing the evidence in the light
most favorable to the verdict, we conclude that a rational trier of fact could
have found Shelton had the intent to murder the complainant and the intent to
destroy or damage the house by fire.  See Hogue v. Johnson, 131 F.3d
466, 507 (5th Cir. 1997) (A[W]e can see no reason that a state must
treat [the defendant] more leniently because he intended to kill [the
complainant] by burning her to death in the house fire, as she lay affixed to
the bed to which he had firmly bound her, than if he had shot her just before
the flames reached her.@).  Shelton=s second issue is
overruled.








C.      Evidence
Linking Shelton to the Offense

In his third issue, Shelton argues the evidence is legally
insufficient to connect him with the commission of any offense that occurred at
Pham=s home on the date
alleged.  Shelton argues that the only evidence offered to support the
capital-murder conviction was cell-phone records that purported to show his
phone was not at his house during a time he said he was home, and a voicemail
message in which he said he was going to Pham=s house the
morning of the fire.

Reviewing the evidence in the light most favorable to the
verdict, the record reveals the following evidence identifying Shelton as the
perpetrator: At 12:55 a.m., the morning of the fire, Pham sent a text message
to Shelton asking him to leave her alone.  About 15 minutes later, Shelton
responded by phoning Pham at her home leaving angry messages about their
relationship and expressing anger about her behavior toward other men while on
the cruise and about photographs of her on the cruise.  At 2:00 a.m., Pham left
a bar, drove a friend home, and told the friend that she planned to go home. 
At 2:48 a.m., Shelton left a voicemail message for Pham telling her he was
going to her home.  Cell-phone records from Shelton=s phone indicate
that between 2:57 and 2:59 a.m., Shelton was traveling north from his home
toward her home.  








There were no signs of a forced entry at Pham=s house,
suggesting she knew her killer.  Witnesses testified that Shelton had a key to
Pham=s home and it was
common for her to demand the return of her key when she and Shelton argued. 
Although Shelton showed Sergeant Holtke the text message Pham sent him, he did
not tell Holtke about the voicemail messages he left for her.  Further, Shelton
told Holtke he did not leave his home after 1:30  the morning of the fire, but
Shelton=s cell-phone
records show that he left his home and traveled toward Pham=s home while
either phoning or sending text messages 29 times.  Several witnesses testified
that Shelton and Pham had an Aon-again, off-again@ romantic
relationship.  Some of those witnesses traveled with Shelton and Pham on a
recent cruise vacation.  Luggage and photographs from the vacation were doused
with gasoline on the night of the fire.

The identity of the perpetrator of an offense can be proved
by direct or circumstantial evidence.  Earls v. State, 707 S.W.2d 82, 85
(Tex. Crim. App. 1986).  Here, the physical evidence indicates that Pham either
opened the door to her killer, or he had a key.  The evidence also shows that
before the fire, Shelton contacted Pham via cell phone as he drove in a
direction consistent with driving from his home to her home.  Further, he left
angry messages on her phone arguing with her and telling her he was coming to
her home.  Shelton lied about leaving his home prior to the fire, and failed to
reveal communications he had with Pham shortly before her death.  Viewing the
evidence in the light most favorable to the verdict, a rational trier of fact
could have found beyond a reasonable doubt that Shelton was the person who
entered the complainant=s home, bound her, and set fire to her and
her home.  Shelton=s third issue is overruled.

Voir Dire

In his fourth and fifth issues, Shelton argues the trial
court erred in sustaining the State=s objections to
improper commitment questions during voir dire and in overruling his objections
to improper commitment questions.

A.      Standard
of Review








The trial court may impose reasonable restrictions on the
exercise of voir dire examination.  Boyd v. State, 811 S.W.2d 105, 115
(Tex. Crim. App. 1991).  The trial court may limit voir dire when a question
commits a venire member to a specific set of facts.  Standefer v. State,
59 S.W.3d 177, 182B83 (Tex. Crim. App. 2001).  A trial court
may not, however, restrict proper questions that seek to discover a prospective
juror=s views on
relevant issues. McCarter v. State, 837 S.W.2d 117, 121B22 (Tex. Crim.
App. 1992).  Although voir dire examination is largely within the sound
discretion of the trial court, a trial court abuses its discretion when its
denial of the right to ask a proper question prevents determination of whether
grounds exist to challenge for cause or denies intelligent use of peremptory
challenges.  Mason v. State, 116 S.W.3d 248, 253 (Tex. App.CHouston [14th
Dist.] 2003, pet. ref=d).

A commitment question is one that commits a prospective
juror to resolve, or to refrain from resolving, an issue a certain way after
learning a particular fact.  Standefer, 59 S.W.3d at 179.  For a
commitment question to be proper, it must contain only those facts necessary to
test whether a prospective juror is challengeable for cause.  Id. at
182.  Two questions are relevant to determine whether an improper commitment
question has been asked: (1) Is the question a commitment question, and (2)
Does the question include factsCand only those factsCthat lead to a
valid challenge for cause?  Id.  If the question is a commitment
question, but does not include only the facts that lead to a valid challenge
for cause, the trial court should not permit the question.  Id. at 182B83.

B.      Shelton=s Voir Dire
Questions

During voir dire, Shelton=s attorney asked
the following two questions:

If you have a scenario where somebody goes in somebody=s house and kills them and then
they later B and there=s really no evidence as to when a
fire was started or not, but you have evidence that the person was murdered in
some fashion, and then they later make the decision to burn the house down to
cover it up, do you think that=s capital murder?

 

[Prosecutor]: Objection, Your Honor.  That=s asking the jurors to commit to a
specific set of facts.

 

THE COURT: Sustained.

 

[Defense Attorney]:  Well, along the lines of what Ms. Barnett was
talking about earlier in her examples.  If you have a scenario where a house is
burned, but there=s no evidence as to whether the
fire caused it and there=s a possibility the fire was set
after the death, is that necessarily a capital murder, in your view?








[Prosecutor]: Objection, Your Honor.  That=s asking the jurors to commit to a
specific set of facts.

 

THE COURT: Sustained.

 

[Defense Counsel]: All right. 
Well, let me submit to you B you=re off the hook B that B let me submit to
you that there=s a question at that point as to whether the murder
was committed while in the course of an arson or whether the arson was an afterthought,
all right?

Shelton=s questions were commitment questions in
that they asked whether prospective jurors would resolve the issue of capital
murder based on a particular set of facts.  We now turn to whether the commitment
questions were improper.

To determine whether the commitment questions were
improper, we must determine whether the questions contained only those facts
that would lead to a valid challenge for cause.  A prospective juror may be
challenged for cause if (1) he possesses a bias or prejudice in favor of or
against the defendant; (2) he possesses a bias against a phase of the law upon
which the State or the defendant is entitled to rely; or (3) he has already
decided the defendant=s guilt or punishment.  Barajas v.
State, 93 S.W.3d 36, 39 (Tex. Crim. App. 2002); see also Tex. Code
Crim. Proc. Ann. art. 35.16 (Vernon 2006). 

Shelton does not argue that the questions were designed to
lead to a valid challenge, but argues they should have been permitted to
educate the jury in response to the following remarks made by the prosecutor
during voir dire:

Let=s say I go over to my brother=s house and I know he=s at home asleep at 9:00 o=clock [sic].  And I set his house
on fire to kill him.  That is a capital murder.  Does that make sense?

Okay.  So, we=ve set a house on fire, nobody=s in the house, not capital.

We=ve set a house on fire, we don=t know if anybody=s in the house, not capital.








We=ve set a house on fire, we know
somebody=s in the house and we kill them,
that=s capital.  Does that make sense? 
Anybody have any questions?

Let=s say I set the house on fire by
setting the body on fire.  That=s capital murder.  Does that make sense?

Now, let=s say I kill the person and they=re really not dead, but I don=t know that.  I=m trying to kill them.  I think
they=re dead, but they=re not really dead and I set the
house on fire, that=s capital.  Does that make sense?

 

Shelton did not object to the prosecutor=s statements at
trial, but on appeal claims his improper commitment questions were necessary,
not to lead to a valid challenge for cause, but to Acorrect the
prosecutor=s misleading statements on the relationship between
arson and murder in proving a capital murder case.@  While it is
impermissible to ask about a prospective juror=s ability to
convict an individual on a particular set of facts, it is permissible to use
hypothetical situations to explain the application of the law.  Atkins v.
State, 951 S.W.2d 787, 789 (Tex. Crim. App. 1997).  The prosecutor=s hypothetical
situations were not impermissible; therefore, it was not necessary for Shelton
to correct the prosecutor=s statements.  Shelton has failed to show
how the commitment questions were designed to lead to a valid challenge for
cause.  The trial court did not abuse its discretion in sustaining the State=s objections. 
Shelton=s fourth issue is
overruled.

C.      The State=s Voir Dire
Question

In his fifth issue, Shelton argues the trial court erred in
overruling his objection to the prosecutor=s question during
voir dire because the prosecutor improperly committed the venire to finding
Shelton guilty even if the State was unable to prove the manner and means of
death.  The prosecutor asked the following question:

Is there anybody here who thinks, well, if you cannot show me exactly
how this person died, I just don=t think I could find the person guilty.  I believe they did
it, but if you can=t prove to me exactly how they did
it, I don=t think I can find him guilty. 
Anybody feel that way?

 








The State concedes the question was a commitment question,
but argues that the question contained only facts necessary to lead to a valid
challenge for cause.  The question asked the prospective jurors whether they
would require the State to prove exactly how the accused murdered the victim,
which is not an element of the offense.  See Garrett v. State, 682
S.W.2d 301, 308 (Tex. Crim. App. 1984) (holding that an unknown manner and
means is not an essential element of the offense of capital murder).  The State
may properly challenge a prospective juror for cause when the juror would hold
the State to a higher standard than Abeyond a
reasonable doubt.@  Coleman v. State, 881 S.W.2d 344,
360 (Tex. Crim. App. 1994).  The State=s question was
designed to identify potential jurors that would hold the State to a higher
burden of proof, i.e., proof not required as an element of the offense.
Because the State=s question only contained facts necessary
to identify prospective jurors who might not be able to follow the law, the
question was not improper.  Shelton=s fifth issue is
overruled.

The judgment of the trial court is affirmed.

 

 

 

 

/s/      Jeffrey V. Brown

Justice

 

 

 

 

Panel consists of
Justices Frost, Brown, and Boyce.

Do Not Publish C Tex. R. App. P. 47.2(b).

 









[1]  Sergeant McDaniel used the term Acommunication event@ to
refer to both telephone calls and text messages.





[2]  Shelton=s
defensive theory was that the State=s
evidence did not prove his guilt beyond a reasonable doubt.  As to the theory
that the complainant=s ex-husband committed the offense, Shelton=s counsel did not mention this theory in opening
statement or in closing argument.  Appellant did not testify or call any
witnesses during the guilt/innocence phase of the trial.  On cross-examination
of the arson investigator, Shelton=s
counsel elicited testimony that the complainant=s next-door neighbor told the investigator that a Amaroon Thunderbird@
was parked in the complainant=s driveway on
the day before the fire occurred.  When asked whether he determined who owned
this vehicle, the investigator stated that he believed it was the complainant=s Aex-boyfriend or
ex-husband@ and that the complainant=s family said the vehicle was owned by the complainant=s Aex.@  There was no other testimony at trial regarding who
owned a Amaroon Thunderbird@ or
as to whether the complainant=s husband owned
such a vehicle. 





[3]  Shelton argues that, by stating in its opening that
the complainant=s ex-husband submitted to a polygraph, the State
implied that appellant must have taken and failed a polygraph because the State
was prosecuting him.  We disagree.  Stating that the complainant=s ex-husband submitted to a polygraph examination does
not suggest that appellant submitted to a polygraph examination.





[4]  Shelton asserts that the trial court exacerbated the
prejudicial effect on the jury by overruling his objection and thus placing its
stamp of judicial approval on the prosecutor=s
statement.  But because the trial court overruled this objection at a bench
conference outside the presence of the jury, this argument lacks merit.  See
Zarco v. State, 210 S.W.3d 816, 828, 831 (Tex. App.CHouston [14th Dist.] 2006, no pet.).





[5]  Shelton argues that this case is similar to Wright
v. State, 154 S.W.3d 235 (Tex. App.CTexarkana
2005, pet. ref=d).  In Wright, the State referred in opening
statement to an investigator=s offer to
defendant Wright to take a polygraph examination, and the trial court overruled
Wright=s objection.  See id. at 238.  In Wright,
however, there was trial testimony over Wright=s objection that he had indeed taken a polygraph examination, and the
error the Wright court found was the trial court=s admission of evidence that the defendant took a
polygraph examination.  See id. at 239.  There was no evidence in this
case that Shelton took a polygraph examination, and the reference to
complainant=s ex-husband was in opening statement not in the trial
evidence.  Therefore, Wright is not on point.  See id.