PD-1600-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/9/2015 11:11:21 AM
Accepted 12/11/2015 10:59:37 AM
ABEL ACOSTA
CLERK

**NO. 09-14-00070-CR**

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

STEPHEN DEMOND ODOM

V.

THE STATE OF TEXAS

FROM THE COURT OF APPEALS FOR THE

NINTH SUPREME JUDICIAL DISTRICT OF TEXAS

BEAUMONT, TEXAS

---

# PETITION FOR DISCRETIONARY REVIEW

---

**Oral Argument Requested**

BOB WORTHAM
CRIMINAL DISTRICT ATTORNEY
JEFFERSON COUNTY, TEXAS

WAYLN G. THOMPSON, ASSISTANT
CRIMINAL DISTRICT ATTORNEY
JEFFERSON COUNTY, TEXAS
TBL # 19959725
1085 PEARL STREET, SUITE 300
BEAUMONT, TEXAS 77701
(409) 835-8550
(thompson@co.jefferson.tx.us)

FILED IN
COURT OF CRIMINAL APPEALS

December 11, 2015

ABEL ACOSTA, CLERK

**IDENTIFICATION OF THE PARTIES AND COUNSEL**

Pursuant to Tex. R. App. Proc. 38.1(a), a complete list of the names of all interested parties is provided below so the members of this Honorable Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of the case.

Stephen Demond Odom, Appellant

Defense Attorney on the Trial:
 Audwin Samuel
 Sean Villery-Samuel
 1965 Park Street
 Beaumont, Texas 77701

Judge Presiding:
 The Honorable John B. Stevens, Jr.

Defense Attorney on the Appeal:
 David W. Barlow
 350 Pine Street, Suite 315
 Beaumont, Texas 77701

Prosecutors on the Trial:
 Lindsey Scott
 Jefferson County Courthouse
 1085 Pearl Street, Suite 300
 Beaumont, Texas  77701

Prosecutor on the Appeal:
 Wayln G. Thompson
 Jefferson County Courthouse
 1085 Pearl Street, Suite 300
 Beaumont, Texas  77701

Bob Wortham, Criminal District Attorney
 Jefferson County Courthouse
 1085 Pearl Street, Suite 300
 Beaumont, Texas  77701

# TABLE OF CONTENTS

INDEX OF AUTHORITIES......................................................................................... ii

STATEMENT OF THE CASE AND PROCEDURAL HISTORY .........................2

GROUNDS FOR REVIEW .....................................................................................3

REQUEST FOR ORAL ARGUMENT ...................................................................3

REASONS FOR REVIEW ......................................................................................4

ARGUMENT AND AUTHORITIES.......................................................................5

PRAYER...................................................................................................................7

CERTIFICATE OF COMPLIANCE.......................................................................8

CERTIFICATE OF SERVICE ................................................................................8

APPENDIX...............................................................................................................9

# INDEX OF AUTHORITIES

**STATUTES**

Tex. Rule Evid. 611(b)......................................................................................3,5

**UNITED STATE CASES**

*U.S. v. Allard,* 464 F.3d 529 (5th Cir. 2006)..............................................6

**TEXAS CASES**

*Nethery v. State*, 692 S.W.2d 686 (Tex.Crim.App. 1985)...........................4

**NO. 09-14-00070-CR**

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

STEPHEN DEMOND ODOM

V.

THE STATE OF TEXAS

FROM THE COURT OF APPEALS FOR THE

NINTH SUPREME JUDICIAL DISTRICT OF TEXAS

BEAUMONT, TEXAS

# PETITION FOR DISCRETIONARY REVIEW

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW, the State of Texas by and through her Criminal District Attorney for Jefferson County, Texas, and respectfully urges this Court to grant discretionary review of the above named cause, pursuant to the rules of the Court.

# I.

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY

Stephen Demond Odom was indicted in a multi-count indictment for the offense of Injury to a Child. He entered a plea of not guilty to both counts and trial was to a jury. The jury found Odom guilty of count one of the indictment and assessed punishment at confinement in the Texas Department of Criminal Justice for life. Odom filed notice of appeal to the Court of Appeals for the Ninth Judicial District of Texas, Beaumont, arguing:

1. The evidence was legally insufficient to sustain the conviction;

2. The trial court erred in allowing the existence of a polygraph examination into evidence over his objection; and

3. The prosecutor was allowed to engage in improper jury argument resulting in egregious harm.

The Court of Appeals handed down an opinion on November 18, 2015, in Case No. 09-14-00070. The Court of Appeals found the evidence to be sufficient to support the conviction but nevertheless reversed and remanded, finding the second issue (the polygraph issue) to be dispositive. The Court of Appeals reversed the trial court's judgment, granted Odom's request for a new trial and remanded the cause to the trial court for further proceedings consistent with its

opinion.  The State filed a Motion for Rehearing on November 24th, 2015.  The Motion for Rehearing was overruled on November 30, 2015.

## II.

## GROUNDS FOR REVIEW

1. The Court of Appeals opinion erroneously precludes the State from offering impeachment evidence under **Tex. Rule Evid. 611(b)** in all instances where the evidence consists of the defendant's failure to take a polygraph test.

2. The Court of Appeals opinion effectively erroneously renders any mention of a polygraph (even in instances where there was no polygraph exam) as error per se, even when the question is asked to correct a false impression and perjurous statement made by a defendant during trial.

## III.

## REQUEST FOR ORAL ARGUMENT

This case involves an important question of evidentiary law that is not resolved: Is the State prohibited from impeaching a lie merely because the impeachment question concerns the witness' failure to submit to a polygraph?

## IV.

## REASONS FOR REVIEW

Stephen Demond Odom lied under oath. When the prosecutor asked if he ever became uncooperative in the investigation, he testified that he did everything they [the police] asked [him] to do, and was never uncooperative. (RR.V:80.) However, he did <u>not</u> fully cooperate with the police: He refused to take a polygraph test. There was no polygraph test, so no test results were ever admitted. This case is not about polygraph results but about whether a witness can be impeached with truthful information establishing that the witness had just lied under oath.

Although the Court of Appeals conducted a balancing test of the probative value of the evidence versus the prejudicial effect of its admission, it premised its decision on the absolute inadmissibility of a polygraph reference, citing *Nethery v. State*, **692 S.W.2d 686 (Tex.Crim.App. 1985)**. The State proffers that *Nethery* is not controlling. *Nethery* dealt with admissibility of polygraph results. *Nethery* did not contemplate admissibility of failure to take a polygraph after a defendant lies about his cooperation with law enforcement. To the extent that *Nethery* may be interpreted as it was by the Court of Appeals, it should be revisited and clarified as not forbidding impeachment of a witness. Had the Court of Appeals not so

4

premised its analysis in this instance, it may have reached a different result in its balancing test.

## V.

## <u>ARGUMENT AND AUTHORITIES</u>

A witness may be cross-examined on any matter relevant to any issue in the case, including credibility. **Tex. Rule Evid. 611(b)**. Stephen Odom lied under oath. Once a lie is told in the courtroom, it is the obligation of the parties to expose it. This is an important issue about the right to impeach a witness on the issue of credibility by exposing perjured testimony.

Talking about a refusing to take a polygraph exam is not the same as talking about the results of a polygraph exam. The implication of an actual existing polygraph exam is that a person passed or failed a questionable scientific test. Rebutting a lie perpetrated by a testifying defendant who is conveying a false impression by telling a lie is totally different. A party must be able to impeach a witness by showing that he is lying, even if impeachment by exposing the lie involves asking whether the witness took a polygraph test when offered by law enforcement.

Mention of a polygraph for impeachment purposes is not entirely novel. In *U.S. v. Allard,* **464 F.3d 529 (5th Cir. 2006**), testimony concerning a polygraph exam was deemed admissible where it was not offered to prove the truth of a polygraph result, but instead offered for the limited purpose of rebutting the defendant's assertion that a confession was coerced. Here, an impeachment question should not be taboo merely because it involves mention of a refusal to take a polygraph test. In light of a defendant's testimony that he was cooperative with an investigation, asking if he refused a polygraph exam merely exposes the lie. Refusing to take a polygraph exam is arguably as relevant to evidence of consciousness of guilt as is running from the scene of the crime.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the State prays that the Texas Court of Criminal Appeals would reverse the opinion of the Court of Appeals, Ninth Judicial District, Beaumont, Texas and that the trial court's judgment and sentence be affirmed or alternatively remanded back to the Court of Appeals for further consideration consistent with a Court of Criminal Appeals opinion that mention of failure to take a polygraph exam is not *per se* inadmissible. The State must be entitled to impeach a defendant's lie.

RESPECTFULLY SUBMITTED

BOB WORTHAM
CRIMINAL DISTRICT ATTORNEY
JEFFERSON COUNTY, TEXAS

*/s/ Wayln G. Thompson*

WAYLN G. THOMPSON, ASSISTANT
CRIMINAL DISTRICT ATTORNEY
JEFFERSON COUNTY, TEXAS
TBL # 19959725
1085 PEARL STREET, SUITE 300
BEAUMONT, TEXAS 77701
(409) 835-8550
(thompson@co.jefferson.tx.us)

7

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), I certify that the number of words in this brief, excluding those matters listed in Rule 94.(i)(1) is 1,003.

*/s/ Wayln G. Thompson*

WAYLN G. THOMPSON, ASSISTANT
CRIMINAL DISTRICT ATTORNEY
JEFFERSON COUNTY, TEXAS
TBL #19959725
1085 PEARL STREET, SUITE 300
BEAUMONT, TEXAS 77701
(409) 835-8550
(thompson@co.jefferson.tx.us)

## CERTIFICATE OF SERVICE

A copy of this brief has been sent by United States Mail to David W. Barlow, Attorney at Law, Edison Plaza, 350 Pine Street, Suite 315, Beaumont, Texas 77701 and Lisa McMinn, State Prosecutor, P.O. Box 13046, Austin, Texas 78711-3046 and the State's brief has been eFiled with the Clerk of the Court of Appeals, this 9th day of December, 2015.

*/s/ Wayln G. Thompson*

WAYLN G. THOMPSON, ASSISTANT
CRIMINAL DISTRICT ATTORNEY
JEFFERSON COUNTY, TEXAS

# **APPENDIX**

# In The

## *Court of Appeals*

### *Ninth District of Texas at Beaumont*

_____

## NO. 09-14-00070-CR
_____

## STEPHEN DEMOND ODOM, Appellant

## V.

## THE STATE OF TEXAS, Appellee

_____

### On Appeal from the Criminal District Court
### Jefferson County, Texas
### Trial Cause No. 13-16301
_____

### MEMORANDUM OPINION

A jury found Stephen Demond Odom guilty of intentionally or knowingly causing serious bodily injury to Jakyra Leatrice Henderson, a child. *See* Tex. Penal Code Ann. § 22.04(a)(1) (West Supp. 2014). In his appeal, Odom argues (1) the evidence is insufficient to sustain his conviction; (2) the trial court erred when it allowed him to be cross-examined about his response to a request by police that he undergo a polygraph; and (3) the prosecutor, in closing, engaged in improper

1

argument. We conclude the trial court abused its discretion by allowing the prosecutor to ask Odom whether he agreed to the request made by police that he take a polygraph. We further conclude Odom was harmed by the error in admitting the evidence about the requested polygraph. We reverse and remand the case for retrial.

## Background

Jakyra, a three-year-old child, died on the morning of January 15, 2012, from complications resulting from injuries that she suffered to her abdomen. Dr. Tommy Brown, the forensic pathologist who performed Jakyra's autopsy, ruled that Jakyra's death was the result of a homicide. According to Dr. Brown, Jakyra's injuries were the result of blunt force trauma that she suffered to her abdomen, resulting in injuries to her liver, mesentery, pancreas, duodenum, and stomach.

Detective Mark Hogge, a police officer employed by the City of Beaumont, investigated Jakyra's death. During Odom's trial, Detective Hogge testified that during his investigation, Odom became a suspect because (1) Odom usually cared for Jakyra while Jakyra's mother, Keneste Lennette, was at work; (2) Jakyra was in Odom's care on the day before her death; (3) all of Jakyra's family members, except Odom, cooperated with the police during the investigation of Jakyra's death; and (4) the police believed that Jakyra died at approximately 4:30 a.m.,

2

significantly earlier than the account Odom gave police when he explained how she died.

A few days after Jakyra died, Nancy Blitch, an investigator employed by the Garth House,[1] interviewed J.W., Jakyra's five-year-old brother. According to Blitch, J.W. did not disclose any information to indicate that Odom had caused Jakyra any injury. Blitch also testified that J.W. did not appear to be frightened of anyone during the interview she conducted of him shortly after Jakyra died.

After failing to discover any evidence connecting Odom to the injuries Jakyra was found to have suffered, the police closed their investigation in Jakyra's case without making an arrest. On the anniversary of Jakyra's death, a local television station broadcast a request by Crime Stoppers for the public's assistance in solving Jakyra's homicide. Khristella Joseph[2] responded to the broadcast. Khristella reported to Crime Stoppers that, shortly after Jakyra died, J.W. told her that he saw Odom "kick and punch [Jakyra] in the stomach to make her stop crying."

---

[1] Garth House is a child advocacy center that allows children to state what happened to them to a social worker while the stories are being recorded. Other agencies can then view the recording to avoid repeated interviews about what happened.

[2] During the trial, Khristella testified that she knew Keneste Lennette, Jakrya's mother, because Keneste is her stepfather's niece. Khristella also explained that she knew J.W. and Jakyra.

3

Khristella testified during Odom's trial.[3] According to Khristella, J.W. also told her that he was frightened of Odom. Khristella acknowledged that before calling Crime Stoppers, she did not tell Keneste or Jakyra's grandmother about what J.W. said to her before Jakyra's funeral. Khristella also acknowledged that she had received a reward for the information she gave to Crime Stoppers. To explain why she did not come forward earlier, Joseph stated that she did not know about the results of Jakyra's autopsy before she heard the television broadcast indicating that the police needed assistance to solve Jakyra's homicide.

Acting on Khristella's tip, the police arranged for J.W. to undergo a second interview with Blitch. The second interview occurred in January 2013. According to Blitch, in J.W.'s second interview, she asked J.W. what he came to Garth House to talk about: J.W. responded, stating that his mother told him to tell her that Odom had punched his sister in the stomach. During the trial, Blitch testified that it was difficult to tell if J.W. had been coached before his second interview. Blitch stated that during J.W.'s second interview, J.W. told her that he saw Odom strike Jakyra

---

[3] Although tips to crime stoppers organizations are generally privileged, reports to such organizations under some circumstances may become admissible. *See* Tex. Gov't Code Ann. § 414.008 (West 2012). The record does not reflect how the parties discovered Khristella's identity. Although Odom raised several objections to Khristella's testimony at trial, none of the objections were pursued in Odom's appeal.

4

in the stomach. Blitch also testified that J.W. gave her a detailed description of the incident when he saw Odom hit Jakyra in the stomach.

In March 2013, the State indicted Odom for intentionally and knowingly causing serious bodily injury to Jakyra by hitting her with his hand. The indictment alleges that the incident occurred on or about November 20, 2011. In a second count, the State alleged that on or about that same date, Odom recklessly caused serious bodily injury to Jakyra by hitting her with his hand.

A total of sixteen witnesses testified during the guilt-innocence phase of the case, including Odom, who testified in his own defense.[4] The only witness who testified that Odom struck Jakyra was J.W. He was seven years old when Odom's trial occurred. Based largely on J.W.'s testimony, the jury convicted Odom for knowingly or intentionally injuring Jakyra by hitting her with his hand.[5] Following the punishment phase of the trial, the jury assessed a life sentence.

---

[4] In the punishment phase of the case, the State called no witnesses, but Odom and four other witnesses testified for Odom in the punishment phase of the case. The witnesses who testified in the punishment phase of the case did not give the jury information that indicated that Odom had caused Jakyra's injuries, and Odom continued to assert that he never struck Jakyra while she was in his care.

[5] Based on the trial court's instructions, the jury returned no findings on count two of the indictment.

## Sufficiency of the Evidence

In issue one, Odom argues that the evidence is insufficient to show that he knowingly or intentionally caused Jakyra's injury. According to Odom, the State's evidence showed only that he intended to engage in the conduct of striking Jakyra with his hand, but he argues that the evidence fails to show that he knowingly or intentionally caused Jakyra's injury. In response, the State argues that the record contains sufficient evidence to infer that Odom, when he hit Jakyra, intentionally or knowingly caused Jakyra to suffer a serious injury.

When reviewing the sufficiency of the evidence supporting a conviction, an appellate court considers all of the evidence in the light most favorable to the verdict to decide whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). In reaching its verdict, a jury is entitled to view the circumstantial evidence that is before it in a trial as being just as probative as the direct evidence that is relevant to proving a defendant's guilt. *Temple*, 390 S.W.3d at 359. Additionally, in some cases, a defendant's guilt may be established by circumstantial evidence alone. *Id.*

In this case, Odom's first issue challenges whether the evidence before the jury was sufficient to show that he acted knowingly or intentionally in causing Jakyra's injury. A defendant's intent may be inferred from circumstantial evidence such as the acts, the words, and the conduct of the defendant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). When a jury's findings depend wholly on circumstantial evidence, every fact need not point directly and independently to the guilt of the defendant; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id.* at 49. In resolving any conflicting inferences that may arise from the evidence in a case, the jury is the sole judge of the credibility and weight to be attached to the testimony of the witnesses. *Jackson*, 443 U.S. at 319. When the record supports conflicting inferences, appeals courts are required to presume that the jury resolved such conflicts in favor of the verdict, and they must defer to the jury's resolution of the conflicts that exist in the testimony. *Temple*, 390 S.W.3d at 360 (citing *Jackson*, 443 U.S. at 326).

In Odom's case, both direct and circumstantial evidence points to Odom as the person who was responsible for causing the severe internal injuries that were discovered during Jakyra's autopsy. For example, in addition to J.W.'s testimony about having seen Odom strike Jakyra in the stomach, there was medical testimony

7

before the jury that someone with the strength of an adult would be required to inflict the severity of the internal injuries that she suffered. Additionally, the medical testimony showed that Jakyra had old internal injuries that were healing as well as more recent internal injuries. Medical testimony indicated that the pattern of new injuries superimposed on older injuries that were healing indicated that Jakyra's injuries were probably not the result of an accident. A pediatrician, called as an expert witness by the State, concluded that Jakyra had been a victim of abuse. The medical testimony also indicates that a significant amount of force would be required to inflict the extent of the internal injuries Jakyra suffered.

When Odom testified in the guilt phase of the case, he denied that he ever hit Jakyra. However, as the sole judge of the credibility of the witnesses, the jury was entitled to find that Odom's denial was not credible. *Jackson*, 443 U.S. at 319. In resolving the conflicting inferences from the evidence, the jury was entitled to view Odom's suggestion—that Jakyra's stomach symptoms were caused by drinking soured milk—as suspicious. In this case, the jury was entitled to conclude that Jakyra's injuries were caused by an adult, and to conclude that Odom was the adult who caused the injuries to Jakyra's stomach.

The jury was also entitled to infer that Odom acted knowingly or intentionally in causing Jakyra to suffer a serious injury. In criminal cases, the

8

defendant's state of mind is almost always proven through circumstantial evidence. *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); *Lopez v. State*, 630 S.W.2d 936, 942 (Tex. Crim. App. 1982). Intent can be inferred from the acts, words, and conduct of the accused. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). A person acts intentionally with respect to his conduct when "it is his conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a) (West 2011). A person acts knowingly with respect to the result of his conduct "when he is aware that his conduct is reasonably certain to cause the result." Tex. Penal Code Ann. § 6.03(b) (West 2011). In determining an accused's intent, the events that occurred before, during, and after the offense are relevant to show that the accused acted knowingly or intentionally when he caused the victim's injury. *See Pitonyak v. State*, 253 S.W.3d 834, 844 (Tex. App.—Austin 2008, pet. ref'd).

In this case, the jury was entitled to infer that Odom lied to Keneste about the reason that Jakyra began to suffer symptoms on the day before she died, to infer that Odom engaged in a course of conduct designed to conceal his role in causing Jakyra's injury after her serious injury became apparent to him, and to infer that Odom lied about hitting Jakyra in the stomach. In our opinion, the cumulative force of the direct and circumstantial evidence of his guilt was

9

sufficient to allow the jury to conclude that Odom inflicted the injury intending to cause a serious injury. Viewing the entirety of the direct and circumstantial evidence in the light most favorable to the verdict, we conclude that a rational jury could have found that Odom knowingly or intentionally caused the injury that resulted from his conduct. *See Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. 2013); *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). We overrule issue one.

Request for Polygraph

In issue two, Odom complains that the trial court erred by allowing the prosecutor to question him about being asked by the police to take a polygraph. In response, the State contends that its cross-examination was properly allowed because Odom opened the door to the questions about the polygraph when he responded to a question from the prosecutor asking if he ever became uncooperative in the investigation when he responded by testifying that he did "everything [the police] asked [him] to do." After Odom made that statement, the trial court interrupted the proceedings, asked the attorneys to approach the bench, and discussed with the attorneys whether Odom opened the door to being questioned "in all fairness, to everything." Given the context of the discussion,[6] the

---

[6] The transcript of the trial reflects that several questions earlier, the prosecutor asked Odom whether he "cooperated with them and did everything that they asked of [him]?" Odom responded: "I did whatever they asked me to do."

10

trial court's reference to "everything" clearly referenced the trial court's earlier discussion with the attorneys for the parties about whether it would allow testimony about the polygraph to be placed before the jury. At that point, Odom's attorney advised the court that even if the trial court considered the testimony to now be relevant, any evidence about the polygraph would be more prejudicial than probative on the question of whether Odom had been cooperative with the police. *See* Tex. R. Evid. 403. The trial court denied Odom's objection, ruling that the probative value of Odom's testimony about the polygraph was "not substantially outweighed by the danger of unfair prejudice."

After the trial court overruled Odom's Rule 403 objection, the prosecutor asked Odom the following questions:

> [Prosecutor:] Mr. Odom, you said you did everything that the police asked you to do. That's not true, is it? It's a yes or no question.
>
> [Odom:] Yes, ma'am.
>
> [Prosecutor:] Because they asked you to submit to a polygraph examination, didn't they?
>
> [Odom:] Yes, ma'am.
>
> [Prosecutor:] And you refused to do that, didn't you?

Odom's attorney objected that the prosecutor was attempting to lead Odom to say he did not give a polygraph. The prosecutor responded by arguing that Odom had opened the door to being asked about the polygraph. At that point, the trial court ruled that the testimony about the polygraph was "not coming in yet."

11

[Odom:] I didn't refuse.

[Prosecutor:] You didn't?

[Odom:] I did not refuse.

[Prosecutor:] Well, did you submit to one?

[Odom:] I didn't submit to one because they supposedly had been getting with my lawyer or over to my lawyer and setting up an appointment with my lawyer. I was doing what my lawyer asked you to do.

[Prosecutor:] Really? You told them you'd take a polygraph when you left; but you never would come back and take one, would you?

[Odom:] I did tell them that I would take one.

[Prosecutor:] Yeah, you told them that?

[Odom:] Yeah, but after I talked --

[Prosecutor:] You didn't show up to take it, did you?

[Odom:] They never told me a definite day to show up.

[Prosecutor:] Didn't you make an appointment and you didn't show up and they kept trying to call you?

[Odom:] No, ma'am, I didn't.

. . . .

[Prosecutor:] The point is you never did show up and take one, did you?

[Odom:] It was never a point in time to take one.

12

[Prosecutor:] So, that is no, right?

[Odom:] No, ma'am.

On appeal, Odom argues that the evidence about the polygraph was inadmissible because his testimony about the circumstances under which he refused the request proved to be more prejudicial than probative. Under Rule 403 of the Texas Rules of Evidence, a trial court is allowed to exclude relevant evidence if the probative value of that evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, causing an undue delay, or the danger of needlessly presenting cumulative evidence. Tex. R. Evid. 403. If the trial court's ruling is in the zone of reasonable disagreement, the ruling will not be found to be erroneous on appeal. *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). A trial court's ruling on a Rule 403 objection is a decision on which a trial court is afforded significant deference. *Id.*

When a party objects that testimony should be excluded because it would be more prejudicial than probative, the trial court is required to engage in a balancing process. *Montgomery v. State*, 810 S.W.2d 372, 389-90 (Tex. Crim. App. 1991) (op. on reh'g). Factors considered in a Rule 403 balancing test include: (1) how compellingly the evidence will make a fact of consequence more or less probable; (2) the potential the prejudicial evidence has to impress the jury "'in some

13

irrational but nevertheless indelible way[;]'" (3) the time it will take the proponent of the evidence to develop it; and (4) the degree to which the proponent needs the evidence to prove a fact of consequence; i.e., does other probative evidence before the jury already establish the fact at issue, and is this fact related to one of the issues in dispute. *See Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (quoting *Montgomery*, 810 S.W.2d at 389-90). In Odom's case, the *unfair* danger posed by the admission of the evidence about the polygraph was that the jury would view Odom's response to the request that he take a polygraph as the equivalent of a test result that indicated he struck Jakyra when that was the fact the State needed to establish to prove its case.

With respect to polygraphs, the Court of Criminal Appeals has consistently ruled that because such tests are not sufficiently reliable, polygraph results are inadmissible at trial. *See Nesbit v. State,* 227 S.W.3d 64, 66 n.4 (Tex. Crim. App. 2007); *Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990); *Castillo v. State,* 739 S.W.2d 280, 293 (Tex. Crim. App. 1987); *Nethery v. State,* 692 S.W.2d 686, 700 (Tex. Crim. App. 1985); *Renesto v. State*, 452 S.W.2d 498, 500 (Tex. Crim. App. 1970); *Placker v. State*, 350 S.W.2d 546, 547 (Tex. Crim. App. 1961); *Davis v. State*, 308 S.W.2d 880, 883 (Tex. Crim. App. 1957); *Stockwell v. State,* 301 S.W.2d 669, 671 (Tex. Crim. App. 1957); *Peterson v. State,* 247 S.W.2d 110,

14

111 (1951). However, Odom did not take a polygraph, so the result is not the matter that the State sought to place before the jury. Nevertheless, even when the result of a polygraph is not disclosed, the Court of Criminal Appeals treats questioning a witness about whether the witness took a polygraph as error. *See Reed v. State*, 522 S.W.2d 466, 468-69 (Tex. Crim. App. 1975); *Hannon v. State*, 475 S.W.2d 800, 802-03 (Tex. Crim. App. 1972); *Renesto*, 452 S.W.2d at 500; *Washburn v. State*, 318 S.W.2d 627, 637 (Tex. Crim. App. 1958). The hostility to evidence about polygraphs appears to be based on the view by courts that juries function better than polygraphs at producing reliable results, and the concern that juries might use evidence about polygraphs, a test viewed by courts as unreliable, as highly relevant and persuasive regarding a person's credibility as related to the defendant's guilt. *See Russell v. State*, 798 S.W.2d 632, 635 (Tex. App.—Fort Worth 1990, no pet.); *Banda v. State*, 727 S.W.2d 679, 682 (Tex. App.—Austin 1987, no pet.).

In Odom's case, the danger of the evidence about the polygraph concerns its potential to indelibly impress the jury that Odom was guilty, when the purpose for which the evidence was being offered was to impeach his statement that he fully cooperated with police. In Odom's trial, the State offered the evidence about the polygraph to impeach Odom's statement that he had done all that the police asked

15

him to do. The Court of Criminal Appeals opinion in *Nichols v. State*, 378 S.W.2d 335 (Tex. Crim. App. 1964), is instructive regarding whether the admission of the evidence about the polygraph in Odom's case was error. In *Nichols*, the prosecutor asked a prosecution witness to tell the jury, without disclosing the results, whether she had submitted to a polygraph. *Id.* at 336. The witness indicated that she had taken a polygraph. *Id.* In reversing the defendant's conviction, the Court of Criminal Appeals found the question harmful because the question implied that the witness would have passed the polygraph even though the result was never admitted. *Id.* In *Nichols*, the trial court instructed the jury that it could not consider the evidence about the polygraph for any purpose, but even the trial court's instruction was insufficient to overcome the harm resulting from the prosecutor's question. *Id.* at 337-38. The *Nichols* Court stated: "We think it fair to observe that the only reason that anyone would possibly take a lie detector test would be to determine whether or not they were telling the truth." *Id.* at 337; *see also Russell*, 798 S.W.2d at 635 ("Clearly, any reference to polygraph or lie detector tests is improper even when the test result is not disclosed."). In Odom's case, the jury was given no guidance about the limited purpose for which the evidence was offered, and there was no evidence before the jury discussing the reliability (or unreliability) of polygraphs.

16

In final argument in Odom's case, the prosecutor suggested that Odom refused the polygraph because the test result would have revealed that he was guilty. In other words, like *Nichols*, the record shows that the true purpose of the State's offer was not limited to impeaching Odom's statement. Instead, the manifest purpose for the polygraph evidence was to imply the result, that Odom would have failed the test had it been taken. The danger of unfair prejudice regarding evidence about polygraphs is particularly acute when the evidence before the jury contains no testimony about the accuracy (or inaccuracy) of polygraphs. While the State did not spend a significant amount of time at trial developing the evidence, the potential the evidence has to impress juries in an irrational and indelible manner in Odom's case was very high given the fact that he chose to testify during the guilt phase of his trial. In Odom's case, the danger of admitting the evidence includes the risk that the jury would rely largely if not entirely on Odom's refusal to take the test when evaluating the credibility of his testimony.

The trial court was also required to weigh the degree to which the State needed the evidence to contradict Odom's testimony that he had been fully cooperative with the police. On this record, testimony indicating that Odom had not been fully cooperative with the investigation by the police was cumulative of

17

other testimony about that fact that was already before the jury when Odom testified. Before Odom testified, Keneste and Detective Hogge had testified that Odom became uncooperative as the investigation into Jakyra's death developed. The record does not show that the State had a significant need of the evidence about the polygraph to establish that Odom had not fully cooperated with the investigation conducted by the police into Jakyra's death. Although the State did not spend a great deal of time developing the evidence about the polygraph, we agree with Odom that the testimony was significantly more prejudicial than it was probative. We conclude the trial court abused its discretion by allowing the prosecutor to question Odom about the request by police that he take a polygraph. *Cf. Martinez v. State*, 728 S.W.2d 360, 362 (Tex. Crim. App. 1987) (allowing impeachment when a defendant leaves a false impression as to his criminal record where he "voluntarily testifies as to his prior criminal record without any prompting or maneuvering on the part of the State[]"); *Nethery*, 692 S.W.2d at 700 (holding that the results of a polygraph test are not admissible at trial for any purpose, whether offered on behalf of the State or the defendant); *Bates v. State*, 587 S.W.2d 121, 133 (Tex. Crim. App. 1979) (explaining that when a witness is cross-examined on a collateral matter, a matter on which the cross-examining party would not be allowed to prove if the testimony were to be offered as a part of its

18

case in chief, "the cross-examining party cannot then contradict the witness"); *Mauldin v. State*, 308 S.W.2d 36, 38 (Tex. Crim. App. 1957) (explaining that impeachment not allowed where the cross-examination concerns an immaterial matter).

Given our conclusion that the testimony about the polygraph should not have been admitted, we must determine whether the error was harmless. Tex. R. App. P. 44.2(b) (requiring the court, on appeal, to disregard errors, defects, irregularities, or variances that do not affect substantial rights). An error in admitting evidence is generally reviewed as non-constitutional error, so the error must be disregarded (and the case affirmed) unless the error "'has a substantial and injurious effect or influence in determining the jury's verdict.'" *Russell v. State*, 155 S.W.3d 176, 179 (Tex. Crim. App. 2005) (quoting *Simpson v. State*, 119 S.W.3d 262, 266 (Tex. Crim. App. 2003)). We will not overturn a verdict in a case of non-constitutional error where the record as a whole shows that "the error did not influence the jury, or influenced the jury only slightly." *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001) (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). "In considering the potential to harm, the focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict." *Barshaw v. State*,

19

342 S.W.3d 91, 93-94 (Tex. Crim. App. 2011). An appellate court must, however, reverse a trial court's decision to admit evidence if the evidence should not have been admitted and if, after reviewing the record as a whole, the court has "grave doubt that the result of the trial was free from the substantial effect of the error." *Id.* at 94.

With the exception of the testimony of J.W., the State's evidence against Odom was largely circumstantial. Some of the circumstantial evidence the jury likely utilized to reach its conclusion that Odom was guilty, beyond reasonable doubt, included:

- The evidence showing that Odom was one of Jakyra's primary caregivers and that he was the only caregiver who was uncooperative with the investigation by the police;

- The medical evidence showing that Jakyra died around 4:30 a.m., over an hour before Odom took Jakyra to the nursing home with Keneste;

- The medical evidence showing that Jakyra's new injury probably occurred within forty-eight hours of her death, and that Jakyra was in Odom's care during portions of that period;

20

- The evidence that J.W. told his grandmother and Khristella that he saw Odom strike his sister before Jakyra's funeral;

- The evidence showing that Odom appeared surprised when he woke up at the nursing home around 7:00 a.m., claiming he discovered at that time that Jakyra was not breathing, given medical evidence showing that Jakyra probably died around 4:30 a.m.;

- Medical evidence showing that Jakyra was exhibiting signs of rigor mortis when initially treated by the paramedic at the nursing home.

Much of the conflicting evidence the jury could have chosen to believe was dependent on the jury's assessment of Odom's credibility. For instance, Odom was not the only adult around Jakyra in the forty-eight hour period before she died, so he is not the only adult who could have caused the injuries. Odom's testimony about when he discovered Jakyra's death also depended on the jury evaluation of his credibility. The medical evidence that Jakyra died at approximately 4:30 a.m. was based on a statement made by the doctor who pronounced Jakyra's death, but that doctor did not testify during Odom's trial, and the record contains nothing to explain how approximate that doctor's estimate was regarding the hour of Jakyra's death. While Dr. Brown testified that he agreed with the hospital doctor's estimate regarding Jakyra's time of death, he acknowledged that Jakyra might have still

21

been alive around 6:20 a.m.[7] Moreover, the record is not clear about when Odom first arrived at the nursing home, but Keneste testified that her normal shift started at 6:00 a.m. In other words, without the evidence about the polygraph, we harbor doubts about whether the jury would have viewed the evidence placing the death at 4:30 as likely, given other evidence in the record from those at the nursing home, including J.W., indicating that Jakyra was still alive when she was there. Odom's refusal to take a polygraph, in our view, significantly influenced the manner the jury went about its job of evaluating Odom's credibility.

Given J.W.'s inconsistent account about Odom's role in causing Jakyra's injury, we harbor grave doubt about whether the testimony regarding the polygraph had no influence or but slight influence in making the jury more likely to accept J.W.'s trial testimony that he saw Odom strike Jakyra in the stomach. In our view, given the evidence that Odom refused the polygraph, the jury was much more likely to accept J.W.'s testimony without seriously questioning why he failed to give this information during his first interview about the circumstances of Jakyra's death. In summary, given the quality of the direct and circumstantial evidence as a

---

[7] When asked how long Jakyra had been dead before being pronounced dead at 7:20 a.m. in the emergency room, Dr. Brown testified "I can't be exact about it[,]" and he indicated that he would put the actual death at "about that time." Dr. Noble, the State's expert, did not express an opinion regarding the hour that he felt Jakyra likely died.

whole, we have grave doubts about whether that testimony about the polygraph had no significant influence on the jury's view of the evidence admitted at trial relevant to Odom's guilt. Under the circumstances, we conclude that the evidence about the polygraph diminished the jury's role in assessing the credibility of the direct and circumstantial evidence relevant to Odom's guilt. *See United States v. Scheffer*, 523 U.S. 303, 313 (1998) ("By its very nature, polygraph evidence may diminish the jury's role in making credibility determinations.").

Considering the evidence as a whole, we conclude the evidence about the request by police for a polygraph played a substantial and injurious role that influenced the jury's verdict. *See Russell,* 155 S.W.3d at 179. The harmful impact of the inadmissible testimony was driven home by the prosecutor, when in closing she argued that Odom refused to take a polygraph because he was guilty. *See Scheffer*, 523 U.S. at 312-13 (noting that polygraph evidence threatens "the [jury's] core function of making credibility determinations in criminal trials"). Given the indelible impression the evidence made on this jury after considering the record as a whole, the lack of consensus on the reliability of polygraphs generally, the manner the State used the evidence in final argument, and the jurisprudence from the Court of Criminal Appeals indicating that such tests are not admissible for any purpose, we hold that the trial court's error in admitting the testimony about the

23

request for the polygraph was harmful. *See Ross v. State*, 133 S.W.3d 618, 626 (Tex. Crim. App. 2004) (noting the lack of consensus on the reliability of polygraph tests); *Tennard*, 802 S.W.2d at 683 (noting that "[t]he existence and results of a polygraph examination are inadmissible for all purposes"). Because the admission of the testimony was harmful, we sustain issue two and hold that Odom is entitled to a new trial. *See Barshaw*, 342 S.W.3d at 94.

## Conclusion

Because issue two is dispositive, we need not address issue three. *See* Tex. R. App. P. 47.1. Accordingly, we reverse the trial court's judgment, we grant Odom's request for a new trial, and we remand the cause to the trial court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

_____
HOLLIS HORTON
Justice

Submitted on November 4, 2014
Opinion Delivered November 18, 2015
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.

24

# IN THE NINTH COURT OF APPEALS

09-14-00070-CR

Stephen Demond Odom

v.

The State of Texas

On Appeal from the
Criminal District Court of Jefferson County, Texas
Trial Cause No. 13-16301

## **JUDGMENT**

THE NINTH COURT OF APPEALS, having considered this cause on appeal, concludes that the judgment of the trial court should be reversed and the cause remanded to the trial court. IT IS THEREFORE ORDERED, that the judgment of the trial court is reversed. The cause is remanded to the trial court for a new trial and further proceedings consistent with this Court's opinion.

Opinion of the Court delivered by Justice Hollis Horton

November 18, 2015

### **REVERSED AND REMANDED**

\*\*\*\*\*\*\*\*\*\*

Copies of this judgment and the Court's opinion are certified for observance.

Carol Anne Harley
Clerk of the Court